676 So.2d 692 (1996)
STATE of Louisiana, Appellee,
v.
Mitchell HEBERT, Defendant-Appellant.
No. K95-1645.
Court of Appeal of Louisiana, Third Circuit.
June 5, 1996.
*694 Michael Harson, Lafayette, Keith A. Stutes Asst. Dist. Atty., for State of Louisiana.
G. Paul Marx, Lafayette, for Mitchell Hebert.
Before DOUCET, C.J., and YELVERTON and PETERS, JJ.
YELVERTON, Judge.
This supervisory writ application by the defendant, Mitchell Hebert, has been remanded to this court by order of the Louisiana Supreme Court. Mitchell Hebert and his codefendant, Shawn Gaspard, are charged with first degree murder. Both defendants originally filed pretrial writ applications with this court of appeal, seeking review of trial court rulings denying several motions including a motion to suppress, a motion to exclude other crimes evidence, and a motion to quash. We denied the writ applications. Defendant Hebert applied for a writ of certiorari with the Louisiana Supreme Court. The supreme court granted a stay and remanded the matter for briefing, argument, and issuance of an opinion concerning the motion to suppress the confession. State v. Herbert, 96-0352 (La. 3/22/96); 669 So.2d 1228. We are now at the opinion stage of the remand.

FACTS:
The Lafayette Police Department received a call at 9:00 a.m. on October 2, 1992, that there had been a homicide at the Green Oaks Lounge on Guilbeau Road in Lafayette. Inside the lounge, the police found the body of Gerald Green, the manager of the lounge, behind the bar; the victim had been beaten, and his throat slashed from ear to ear. Money and receipts from a money box were on the floor. There were two separate sets of bloody footprints at the scene. An investigation proceeded on the assumption that two men had committed the crime.
That same lounge had been burglarized eleven days earlier, on September 21, 1992, but no suspects had been found. A residential burglary had been committed just one week earlier at the Bell Downs Townhomes and Condominiums located directly behind the Green Oaks Lounge. A fingerprint from *695 Shawn Gaspard had been found at the scene of the residential burglary, and an arrest warrant for Gaspard was outstanding. As of October 2, 1992, Gaspard had not been located and arrested on the burglary warrant. When the lead detective, Detective Ted Vincent, learned about the recent criminal activity in the locale and the discovery of Gaspard's fingerprint, he directed Detective Kelly Gibson and Detective Hundley to find Gaspard and bring him in for questioning.
Detective Gibson learned from Gaspard's mother that he was living on Guilbeau Road in the Gallery Apartments, about one block from the Green Oaks Lounge. While searching for Gaspard at the Gallery Apartments, the detectives found out that Gaspard and Hebert were keeping company and living with others at that apartment complex.
When the detectives spoke with Heather Findley and Crystal Fontenot, the women that Hebert and Gaspard were living with in the Gallery Apartments, one of the women said that both men had been out the night before, and that they had come in at 3:50 a.m. that morning. She related that when she asked them why they came in so late, both men insisted that they came home at 1:30 a.m. This, according to the informing roommate, made her suspicious; she was certain about the time when the men came home.
At the time the police talked to these women, they were in the apartment; neither Gaspard nor Hebert were home; it was explained that they had left at 9:00 a.m. telling their roommates they were going to Penrod Drilling to apply for jobs. The detectives checked at Penrod Drilling later and discovered that neither Gaspard nor Hebert had been there.
Detective Vincent joined the other detectives around noon at the Gallery Apartments, and together they continued to look for Gaspard and Hebert. A few minutes before 1:00 p.m. that afternoon, Detective Vincent saw two men in the complex and asked them their names; they were Mitchell Hebert and Shawn Gaspard. Gaspard was immediately arrested on the outstanding burglary warrant. Mitchell Hebert was asked to come down to the police station for questioning.
As the detectives were going to their cars to leave the Gallery Apartments, Evelyn Everett, a woman from the apartment complex next door, hollered for them. Detective Vincent responded. She wanted to know if Shawn Gaspard had been arrested. When Detective Vincent said he had, she handed them a shopping bag, saying that Gaspard had left it with her, and that she wanted nothing to do with what Gaspard may have done. Inside the shopping bag the detectives found newly purchased clothing with receipts indicating that the clothes were purchased at 10:00 a.m. and 12:00 noon, that very day. The defendants had already left for the police station, and they were not aware that the police knew about this shopping bag.
At the police station, the police first took the written statements of Heather Findley and Crystal Fontenot. Then Detective Gibson began to speak with Mitchell Hebert. His questioning began at 2:30 p.m., with the detective going over the rights form with him. After this, Hebert signed the rights form, and he began to talk with the detective: Hebert claimed he had returned to his apartment at 1:30 a.m., and that he had gone to Penrod Drilling at 9:00 a.m. to apply for a job. Detective Gibson had found a gold chain in a jacket when Gaspard was arrested. When the detective showed the chain to Hebert, he said he received it from either Heather Findley or Crystal Fontenot. When the detective asked Hebert about the shopping bag full of new clothes left with Evelyn Everett, Hebert became visibly shaken and nervous and said, "I don't want to talk about it." The detective stopped the interview and left Hebert in the room.
Detective Vincent, meanwhile, was attending the autopsy. While waiting for him, Detective Gibson more closely examined the shopping bag of clothes and found over $600 in cash in the pockets. When Detective Vincent arrived at 4:00 p.m., Detective Gibson told him what had happened and what he had found in the shopping bag of clothes. Later, around 5:00 p.m., Detective Gibson found out from Heather Findley that the gold chain belonged to her; she said Mitchell Hebert *696 had stolen it. Detective Gibson did not have a chance to tell Detective Vincent about Hebert stealing the jewelry from Heather Findley because by then Detective Vincent was talking to Hebert.
Detective Vincent had gone in to talk with Hebert a little after 4:00 p.m. The detective thanked Hebert for staying and talking to him. He went over the advice of rights form Hebert had signed with Detective Gibson; when he was finished, Hebert told Detective Vincent he had no problems talking with him. Detective Vincent outlined the evidence the police had obtained concerning the murder and the suspicious activities. The two men continued to talk, taking breaks to eat, drink, or smoke, until Mitchell Hebert began to confess at 6:45 p.m. Mitchell Hebert's full confession was videotaped shortly after 7:00 p.m.
At the conclusion of the hearing on the motion to suppress, the trial judge denied the motion, finding that the police did not violate Hebert's Miranda rights and that his statement was free and voluntary and not the product of fear, coercion, duress, or inducements. Hebert did not testify at the suppression hearing.

ASSIGNMENT OF ERROR NO. 1:
Hebert has divided his writ application into two issues: probable cause to arrest and violation of Miranda. The first assignment of error addresses the lack of probable cause to arrest or detain him.
He argues that he was "arrested" at approximately 12:45 p.m. on October 2, 1992, when both he and Gaspard were taken to the police station. Hebert argues that, this being so, the information known to the police at 12:45 p.m. was insufficient to establish probable cause for a warrantless arrest. He maintains that if he was not "arrested" but simply detained at 12:45 p.m., then his continued detention until his confession at 6:45 p.m. was illegal. This illegal detention allegedly tainted the confession.
Unreasonable searches and seizures are prohibited by both the Fourth Amendment to the United States Constitution and Article 1, § 5 of the Louisiana Constitution. An illegal detention of a person is considered an unreasonable seizure. It is well settled that a seizure conducted without a warrant issued upon probable cause is per se unreasonable unless the warrantless seizure can be justified by one of the narrowly drawn exceptions to the warrant requirement. State v. Tatum, 466 So.2d 29 (La. 1985). La.Code Crim.P. art. 703(D) provides that the State shall bear the burden of proving the admissibility of evidence seized without a warrant.
A form of "seizure" which is permitted without the need of a warrant or probable cause is an investigatory stop made pursuant to La.Code Crim.P. art. 215.1(A). Terry v. State of Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Unlike an arrest which can be made only on probable cause, an investigatory stop may be made under the more relaxed "reasonable suspicion" standard. The right to make an investigatory stop and question the individual detained must be based upon reasonable cause or reasonable suspicion to believe that the person has been, is or is about to be engaged in criminal conduct. La.Code Crim.P. art. 215.1; State v. Belton, 441 So.2d 1195 (La. 1983), cert. denied, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984). An investigatory stop is no less a restriction on a person's liberty of movement than an arrest but is considered a lesser intrusion because it is briefer than an arrest. State v. Vincelli, 555 So.2d 21, 24 (La.App. 1 Cir.1989).
In determining whether or not reasonable cause exists to temporarily detain a person, the totality of the circumstances, "the whole picture," must be considered. Belton, 441 So.2d 1195; State v. Hall, 581 So.2d 337 (La.App. 3 Cir.1991). As was noted by this court in State v. Thibodeaux, 531 So.2d 284 (La.App. 3 Cir.1987), [quoting State v. Bickham, 404 So.2d 929, 931 (La.1981)], reasonable cause for a "Terry stop" is less than probable cause, but the officer must have "articulable knowledge" of particular facts, which in conjunction with reasonable inferences drawn therefrom is sufficient to provide reasonable grounds of past, present or future criminal activity.
*697 As the court noted in State v. Vincelli, 555 So.2d 21, 24-25 (La.App. 1 Cir. 1989):
Inherent in the officer's right to stop an individual and to demand his name, address, and an explanation of his actions is the right to detain him temporarily to verify information given or to obtain information independently of his cooperation. State v. Fauria, 393 So.2d 688 (La.1981).
`The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances.' 3 W. LaFave, Search and Seizure § 9.2(f) (2d printing 1978), p. 38 quoting from State v. Watson, 165 Conn. 577, 345 A.2d 532 (1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1977, 40 L.Ed.2d 311 (1974).
See also State v. Burton, 93-828 (La.App. 3 Cir. 2/23/94); 640 So.2d 342, writ denied and stay denied, 94-0617 (La. 4/7/94); 641 So.2d 203.
A generalized suspicion or "hunch" that an individual is involved in criminal conduct is not sufficient to detain the individual. A police officer must have a particularized suspicion based upon articulable facts. See Thibodeaux, 531 So.2d 284; State v. Thompson, 543 So.2d 1077 (La.App. 2 Cir.), writ denied, 551 So.2d 1335 (La.1989); State v. Bunnell, 517 So.2d 439 (La.App. 1 Cir.1987). If the police officer has a specific suspicion of criminal activity, he may further detain the individual while he diligently pursues a means of investigation likely to quickly confirm or dispel the particular suspicion. U.S. v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).
In the present case, the police knew the following facts at 12:45 p.m. on October 2, 1992:
1. The lounge manager was murdered after the lounge closed at about 2:00 a.m. on October 2, 1992. Two persons were involved because two separate sets of bloody shoe prints were found near the body.
2. Robbery or burglary was the apparent motive since the money box had been rifled through, and receipts and cash were strewn across the murder scene.
3. Shawn Gaspard was believed to have burglarized a nearby residence at the Bell Downs Townhomes and Condominiums, located behind the lounge, one week before the murder, and an arrest warrant had been issued for him for this crime.
4. The lounge had been burglarized by unknown persons eleven days before the murder.
5. Shawn Gaspard and Mitchell Hebert lived at the Gallery Apartments located across the street from the lounge where the murder occurred and near the residence believed to have been burglarized by Gaspard.
6. Gaspard and Hebert were living together.
7. Both Gaspard and Hebert were unemployed.
8. Hebert and Gaspard were gone from their apartment from 9:00 p.m. on October 1, 1992, until 3:50 a.m. on October 2, 1992.
9. One of the roommates of Hebert and Gaspard heard the two men come home at 3:50 a.m. on October 2, 1992, but when she asked the two men why they came home so late, both men insisted that they came home at 1:30 a.m. The roommate was certain the two men came home at 3:50 a.m., and she became suspicious why they would lie about the time.
10. During the morning of October 2, 1992, Gaspard and Hebert told their roommates they were going to Penrod Drilling, Inc. to apply for jobs.
11. No one at Penrod Drilling, Inc. ever spoke to or saw either Gaspard or Hebert during the morning of October 2, 1992.
12. Gaspard and Hebert made purchases of new clothes and new shoes at 10:00 a.m. and 12:00 noon on October 2, 1992, but the two men had no apparent source of the money used to purchase these items.
13. Gaspard and Hebert did not return to their home with the purchases, but surreptitiously *698 left the shopping bag full of their new clothes with Evelyn Everett, who lived in a nearby apartment complex.
The totality of the circumstances gave the police reasonable grounds to suspect past or present criminal activity on the part of Mitchell Hebert. The officers did not merely have a "hunch" that Hebert may have been involved in criminal activity. Once the police had reasonable suspicion that Hebert may have been involved in criminal activity, they could detain defendant while diligently pursuing a means of investigation likely to confirm or dispel this particular suspicion. In the present case, the police took formal statements from Ms. Fontenot and Ms. Findley. Furthermore, Hebert insisted that he had returned home at 1:30 a.m. and that he had gone to Penrod Drilling at 9:00 a.m. to look for a job. At the time they were taken down to the police station, neither defendant knew that Evelyn Everett had turned over to the police the shopping bag full of new clothes defendants had purchased. When Detective Gibson asked Hebert about the bag full of new clothes, Hebert became visibly shaken and nervous and said he did not want to talk about it. With the police's suspicions further aroused, the detention of Hebert could be prolonged, and the investigation enlarged as required by the circumstances. His detention past 2:30 p.m., after his visible reaction upon learning how much the police actually knew about his activities, was not illegal but justified under the circumstances.
A detention may turn into an arrest. The Louisiana Supreme Court has held that "[a]n arrest occurs when the circumstances indicate an intent by the police to effect an extended restraint on the liberty of the accused, rather than at the precise time the officer tells the accused he is under arrest." State v. Simms, 571 So.2d 145, 148 (La.1990). Hebert was asked to come down to the police station at approximately 1:00 p.m., and he invoked his Miranda rights shortly after 2:30 p.m. Although Hebert never asked to leave, if he had, he would have had to wait until Detective Vincent, the lead investigator, spoke to him. Detective Vincent did not return from the autopsy until 4:00 p.m. The detective again informed Hebert of his Miranda rights and defendant spoke with him, occasionally taking breaks, until 6:45 p.m. when Hebert confessed to the murder and robbery. We find that the police had the necessary probable cause to arrest Hebert at 2:30 p.m., the time when a reasonable person would have believed that he was not free to leave. The supreme court in Simms, 571 So.2d at 148-149, noted the following:
Probable cause to arrest exists when the facts and circumstances within the officer's knowledge are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); State v. Wilson, 467 So.2d 503 (La.1985). The determination of probable cause, although requiring something more than bare suspicion, does not require evidence sufficient to support a conviction. Probable cause, as the very name implies, deals with probabilities. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). The determination of probable cause, unlike the determination of guilt at trial, does not require the fine resolution of conflicting evidence that a reasonable doubt or even a preponderance standard demands, and credibility determinations are seldom crucial in deciding whether the available evidence supports a reasonable belief that the person to be arrested has committed a crime. Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); State v. Rodrigue, 437 So.2d 830 (La.1983). The determination of probable cause involves factual and practical considerations of everyday life on which average men, and particularly average police officers, can be expected to act. State v. Ogden and Geraghty, 391 So.2d 434 (La.1980).
The totality of the information known to the police at the time of the arrest in this case was sufficient to justify a man of ordinary caution in believing defendant had committed a crime. Although the police were not yet certain defendant had a part in the actual robbery and murder of the victim, Hebert's sudden wealth, suspicious attempts to create alibis, surreptitiously leaving a shopping bag full of newly purchased clothes with a neighbor, and constant association *699 with Gaspard, wanted for a recent burglary of a nearby residence, gave rise to a belief that Hebert was at least an accessory after the fact to the murder and robbery.
Each fact known to the police at the time of the arrest, when viewed alone, might be explained consistently with innocence. However, probable cause will not be defeated simply because innocent explanations for an activity can be imagined. 1 W. LaFave, Search and Seizure § 3.2(e) (1987). Probable cause exists if a `succession of superficially innocent events had proceeded to the point where a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one.' Id.

... It is not a prerequisite for the existence of probable cause that the police know at the time of the arrest that a particular crime has definitely been committed. State v. Collins, 378 So.2d 928 (La.1979); State v. Drott, 412 So.2d 984 (La.1982). Although certainty of knowledge of the commission of a particular crime is frequently an important factor in the determination of probable cause, probable cause may exist when the commission of a crime has not been definitely established, but is reasonably probable under the totality of the known circumstances.

Simms, 571 So.2d at 149.
The totality of the circumstances known to the police at the time Hebert invoked his Miranda rights was sufficient to justify a belief that he had committed a crime arising out of the murder and robbery of the victim, although the police were not certain he was a participant in the murder and robbery or simply an accessory after the fact. Probable cause to arrest need not be established by evidence sufficient to convict. State v. Freeman, 503 So.2d 753 (La.App. 3 Cir.1987). Therefore, Hebert was not the subject of an illegal arrest.

ASSIGNMENT OF ERROR NO. 2:
By this assignment Hebert claims he invoked his right to silence while talking with Detective Gibson, but he later confessed after talking to Detective Vincent. Hebert argues that Detective Vincent did not honor his invocation of his right to silence as required by Miranda v. Arizona.
The Louisiana Supreme Court has said:
When a defendant invokes his constitutional right to silence, the validity of any subsequent waiver depends upon the `scrupulous honoring' of that right by the police. Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). A majority of this court has concluded that the question of whether an accused's rights are `scrupulously honored' depends on the totality of the circumstances involved under the particular facts of each case. One factor to be considered is who initiates the further questioning. Other factors include `the time delay between the original request and subsequent interrogation, whether Miranda warnings were given before each separate interrogation, whether waiver of rights forms were signed, and whether or not pressures were asserted on the accused by the police between the time he invoked his right ... and the subsequent interrogation.' State v. Harper, 430 So.2d 627, 633 (La.1983).

State v. Brooks, 505 So.2d 714, 722 (La.1987).
In the present case, the second interrogation was initiated by Detective Vincent approximately one to one and one-half hours after defendant told Detective Gibson he did not want to talk about the shopping bag full of new clothes. The detective testified that he began the interrogation by reviewing with Hebert the rights form defendant had previously reviewed and signed with Detective Gibson. Hebert informed Detective Vincent he understood his rights and he had no problems talking with him. Detective Vincent informed Hebert of the evidence he had gathered concerning the murder and robbery and concerning the actions of him and his friend, Gaspard. According to the detective, no pressure, duress, coercion, or inducements were exerted upon Hebert. The two men talked off and on from 4:00 p.m. until 6:45 p.m. They would take breaks for Hebert to eat, drink, or smoke, or Detective Vincent would confer with other detectives working on the case. Around 6:45 p.m., Hebert began to relate the details of the robbery and murder.
*700 In State v. Taylor, 490 So.2d 459 (La. App. 4 Cir.), writ denied, 496 So.2d 344 (La.1986), the accused told the police he did not want to make any statements or talk after he had been informed of his Miranda rights, but one officer explained to the defendant what the investigation of the robbery would entail. The defendant then agreed to talk about the robbery but he refused to give a written statement. The court found that the police did not violate the defendant's right to silence but instead were giving the defendant information in order that he could reconsider his decision not to make a statement.
In State v. Daniel, 378 So.2d 1361, 1366 (La.1979), the defendant told the police he did not want to talk, but an assistant district attorney told the defendant, "[b]efore you make up your mind one way or the other as to whether or not you want to talk to us, let me tell you what we've got." Thereafter, the defendant was informed of the evidence the police had indicating that he killed two people, and the defendant confessed to the murders and took the police to the area where the shotgun used in the murders was hidden. The Louisiana Supreme Court relied upon Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), to rule that the trial court should have denied the motion to suppress:
.... Nothing in Miranda prevents an accused party from changing his mind and giving a statement after he has previously declined to do so, so long as the statement is voluntary and intelligently made. Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); Nash v. Estelle, 560 F.2d 652 (5th Cir.1977); State v. Strahan, 348 So.2d 79 (La.1977); State v. Peevy, 321 So.2d 324 (La.1975). In Mosley the Court said:
`... [A] blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests.'
The Mosley decision has been understood to mean that Miranda should not be construed to create a per se proscription of an indefinite duration upon further custodial interrogation of a defendant who asserts his right to remain silent. And an unrealistic approach to the concept of waiver of these rights can produce anomalous results; therefore, a pragmatic approach is dictated on a case-by-case basis: United States v. Rodriguez-Gastelum, 569 F.2d 482 (9th Cir.1978).

Daniel, 378 So.2d at 1366.
In the present case, it is apparent that Detective Vincent was not browbeating Hebert hoping to wear him down to get him to confess; instead, it appears that the detective first wanted to inform Hebert what evidence he had indicating that he and Gaspard may have been involved in the robbery and murder. Since Hebert was again informed of his Miranda rights, and the detective went over the rights form Hebert signed previously with Detective Gibson, Hebert's decision to change his mind and again waive his rights and speak with Detective Vincent was voluntary and intelligent and not the product of police misconduct. The trial court properly denied the motion to suppress Hebert's confession.
For these reasons, finding that the trial judge ruled correctly, we adhere to our original opinion denying the writ application.
WRIT APPLICATION DENIED.