716 So.2d 63 (1998)
STATE of Louisiana, Appellee,
v.
Mitchell HEBERT, Defendant-Appellant.
No. 97-1742.
Court of Appeal of Louisiana, Third Circuit.
June 3, 1998.
*64 Michael Harson, Lafayette, for State.
Lawrence Charles Billeaud, Lafayette, for Mitchell Hebert.
Mitchell Hebert, pro se.
Before DOUCET, C.J., and DECUIR and AMY, JJ.
DOUCET, Chief Judge.
This is an appeal of a first degree murder conviction and sentence of life imprisonment without benefit of probation, parole or suspension of sentence. The Defendant is Mitchell Hebert. The jury found the Defendant guilty of first degree murder on April 21, 1997, but the next day it was unable to unanimously agree upon the penalty. Accordingly, on July 31, 1997, the trial judge sentenced the Defendant to life imprisonment without benefit of probation, parole or suspension of sentence.
On appeal, the Defendant raises four assignments of error. Three of these assigned errors concern the denial of a motion to suppress. This court has previously addressed the suppression issues in State v. Hebert, 95-1645 (La.App. 3 Cir. 6/5/96); 676 So.2d 692, writ denied, 96-1736 (La.10/11/96); 680 So.2d 643. The remaining issue is the display of the repetitive, bloody photographs of the crime scene.

FACTS
The victim, Gerald "Jerry" Green, managed the Green Oaks Lounge on Guilbeau Road in Lafayette. The lounge was owned by his mother, Jewel Green, and Jerry Green lived with her. It was Mr. Green's routine to close the lounge at 2:00 a.m. and return later in the morning to clean and stock the lounge. On September 22, 1992, the lounge was burglarized and the cash box was stolen. As a result, Mr. Green began taking the cash home with him every night after he closed the lounge.
In the morning of October 2, 1992, Mrs. Green could not locate her son at their home, and her calls to the lounge went unanswered. Carroll "Doc" Bowman, an employee who helped Jerry Green clean and stock the lounge in the mornings arrived at the lounge and found it unlocked and the lights left on. When Doc called out Jerry's name, there was no answer and Doc became suspicious. Mrs. Green arrived at the lounge at this time and when they reentered the lounge, they found a body behind the counter. The body was laying in a large pool of blood. According to Doc Bowman, he could not recognize the body as that of Jerry Green because there was so much blood covering the face. However, he concluded the dead man was Jerry Green when he recognized the shoes on the body as belonging to Mr. Green. Later, *65 Mrs. Green learned that the money from the cash register had been stolen.
Sergeant William Delahoussaye was the first crime scene technician on the scene and he noticed two separate sets of bloody shoe prints. The two sets of bloody shoe prints indicated to the police that two persons committed the crime.
The lead detective, Detective Ted Vincent was informed that the lounge had been burglarized on September 22, 1992, but no suspects had been found. Detective Vincent, wanted to locate Shawn Gaspard and talk to him about the September 22, 1992 burglary and murder at the Green Oaks Lounge. Gaspard was a suspect in another burglary, and an arrest warrant had been issued for him.
Detective Gibson learned that Shawn Gaspard was living in the Gallery Apartments, located on Guilbeau Road about one block from the Green Oaks Lounge. He also learned that Gaspard and a companion, Mitchell Hebert, were living with others at the apartment complex.
Neither Gaspard nor Hebert were home when the police first went by and the police continued to search for the two men. The detectives were informed the two men had said they were going to apply for jobs at Penrod Drilling, but when the police inquired at Penrod Drilling, no one had seen them. Around noon, Detective Vincent joined the other detectives at the Gallery Apartments to continue the search for Gaspard and Hebert. At approximately 1:00 p.m., Detective Vincent saw two men in the complex and asked them their names; it was Mitchell Hebert and Shawn Gaspard. The police immediately arrested Shawn Gaspard on the outstanding burglary warrant. They asked Mitchell Hebert to come to the police station for questioning.
The police investigation revealed more information about the actions of the Defendant and Gaspard. Two cab drivers testified at the trial. The first driver, Stewart Holloway, testified that he picked up two men at approximately 2:15 a.m. on October 2, 1992, at the Mimosa Place Apartments, located one to two miles from the Green Oaks Lounge. Mr. Holloway remembered that one man had blood all over his shirt and that he took the men to the Travel Lodge on Pinhook Road. Another cab driver, Joyce Andrus picked up two men from the Travel Lodge on Pinhook Road at 3:30 a.m. on October 2, 1992, and took them to the Gallery Apartments. At approximately noon on October 2, 1992, Ms. Andrus picked up the same two men at the Acadiana Mall and took them to the Villa Maria Apartments.
When the Defendant and his friend Shawn Gaspard arrived at the Villa Maria Apartments, they gave Evelyn Everett Inzerella a shopping bag full of clothes. Within half an hour, Ms. Inzerella saw the two men being driven away by the police, and she turned over the bag to Detective Gibson. The bag contained new clothes, receipts showing their purchase that morning and almost $600.00 in cash.
At the police station, the Defendant told the police that he had been out with his friend Shawn Gaspard until 1:30 a.m. and that they had left the apartment that morning to go apply for jobs at Penrod Drilling. The detectives knew this information was false. When the detectives had spoken with the women the defendants were living with, one of the women informed the detectives that both men came in at 3:50 a.m. on October 2, 1992. The roommate became suspicious when she later asked the men why they came in so late, and both men insisted that they came home at 1:30 a.m. The Defendant and Gaspard left the apartment at 9:00 a.m., telling their roommates they were going to Penrod Drilling to apply for jobs.
When Detective Gibson asked Hebert about the shopping bag full of new clothes he left with Evelyn Everett Inzerella, Hebert became visibly shaken, nervous and said, "I don't want to talk about it." The detective stopped the interview and left Hebert in the room.
At 4:00 p.m., or shortly after, Detective Vincent informed Hebert about the evidence the police had obtained about the murder and the suspicious activities of him and Gaspard. The two men continued to talk, taking breaks to eat, drink or smoke, until Mitchell Hebert began to confess at 6:45 p.m. Mitchell *66 Hebert's full confession was videotaped shortly after 7:00 p.m.
The Defendant said he and Shawn Gaspard had previously burglarized the Green Oaks Lounge on September 22, 1992. They later wanted to rob Jerry Green of the cash as he left the lounge at night, but that plan fell through. On October 2, 1992, as Jerry Green was closing the lounge, the Defendant and Gaspard came in and asked about their tabs. When Jerry Green went behind the counter, the Defendant began to hit him with his fists and bottles of liquor. Eventually the Defendant slashed the victim's throat. After taking the cash, the Defendant and Shawn Gaspard went to the Travel Lodge to shower and wash the blood off their clothes. They then went back to their apartment. The two men devised alibis for their whereabouts but the police investigation had proven the alibis to be false.
After Mitchell Hebert confessed to the murder, he and Shawn Gaspard were taken to the University Medical Center to give blood, hair and other tissue samples pursuant to search warrants. The police recovered the shoes worn by the Defendant and Gaspard at the time of the murder from a dumpster at the Acadiana Mall. Christopher Henderson, a forensic expert with the crime lab, found that the sole of the left shoe discarded by the Defendant matched the bloody shoe print left at the murder scene. David Epstein, a serologist, determined that the blood found on the Defendant's discarded shoes was consistent with the victim's blood type, and not consistent with the Defendant's blood type nor that of codefendant, Shawn Gaspard.
The jury found the Defendant guilty of first degree murder, but after the penalty phase of the trial, the jury could not unanimously agree on a penalty. Therefore, the Defendant received a sentence of life imprisonment without benefit of parole, probation or suspension of sentence.

ERRORS PATENT
In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by the court for errors patent on the face of the record. Our review of the record, reveals two errors patent.
First, the minutes reflect the Defendant's presence was waived by his counsel during a hearing to determine whether one of the chosen jurors could be excused because of a hardship. The only issue discussed was whether the juror should be excused because of an economic hardship. The trial court denied the juror's request, and required him to remain on the jury. La. Code Crim.P. art. 831 provides in pertinent part:
A. Except as may be provided by local rules of court in accordance with Articles 552 and 551, a defendant charged with a felony shall be present:
(3) At the calling, examination, challenging, impanelling, and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror....
In State v. Kahey, 436 So.2d 475 (La.1983), the court stated the following regarding the absence of the defendant from two pre-trial motions:
Presence of the defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only. Therefore, the presence of the defendant is only essential at proceedings which have a reasonably substantial relation to the fullness of the opportunity of the defendant to defend against the charge. Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934). From this principle has emerged the general rule that no claim of error, or at least no claim of prejudicial error, can be based upon the exclusion or absence of a defendant, pending his trial on a criminal charge, from the courtroom, or from a conference between court and attorneys, during argument on or discussion of a question of law.
Id. at 483 (citations omitted).
Although Kahey is distinguishable from the present case since the hearing in Kahey dealt with pre-trial motions rather than the removal of a juror, we find the analysis is applicable. Mr. Seaux, the juror at issue in the present case, was accepted by both the State *67 and the Defendant without objections. Thus, the refusal of the trial court to allow Mr. Seaux to be excused did not affect the Defendant's opportunity to defend against the charge.
Additionally, we note that in State v. Lane, 414 So.2d 1223 (La.1982), the supreme court applied the contemporaneous objection rule to defense counsel's failure to object to the Defendant's absence from an in chambers hearing on the removal of a juror. The court also noted that defense counsel conferred with the Defendant as to the Defendant's feelings on the removal of the juror.
Considering the above cases, we find the Defendant's absence from the hearing on the removal of Mr. Seaux was harmless error.
Secondly, although the minutes reflect the Defendant was informed of the three-year time limit for filing post-conviction relief as is required by La.Code Crim.P. art. 930.8, the transcript does not. Thus, the district court is directed to inform the Defendant of the provisions of Article 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of this opinion and to file written proof that the Defendant received the notice in the record of the proceedings. See State v. Fontenot, 616 So.2d 1353 (La.App. 3 Cir.); writ denied, 623 So.2d 1334 (La.1993).
We also note the minutes do not reflect that the Defendant was given credit for time served, although the transcript reveals the trial court did give the Defendant such credit at sentencing. In the past we would have recognized this as a patent error and remanded for the trial court to correct the minutes to reflect the Defendant be given credit for time served. However, La.Code Crim.P. art. 880 was amended by Act No. 788 of the 1997 Regular Session, deleting the requirement that the trial court must specifically state that it gave a defendant credit for time served when imposing sentence. The new article 880 provides: "A defendant shall receive credit toward service of his sentence for time spent in actual custody prior to the imposition of sentence." The comment to the article states, "This article makes the credit for prior custody self-operating even on a silent record. It does not change the law." Thus, this court chooses to discontinue recognizing the failure to give credit for time served as an error patent. Since the comment states the amendment does not change the law, we find the amendment applies to those sentences imposed prior to its effective date, August 15, 1997.

ASSIGNMENTS OF ERROR NOS. 1, 2, & 3
These three assignments of error all concern the denial of the motion to suppress filed by the Defendant. This ruling has been reviewed twice by this court. The first review in State v. Hebert, an unpublished writ bearing docket number 95-1645 (La.App. 3 Cir. 1/25/96), resulted in the following writ opinion:

WRIT DENIED: There is no error in the trial court's rulings. The other crimes evidence is admissible at this time, subject to later review at trial on the merits. La. Code Evid. art. 1104; Huddleston v. U.S., 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). We further find the issue of special jury instructions concerning the aggravating circumstances of La.Code Crim.P. art. 905.4(A)(7) is premature.
The Defendant sought review by the Louisiana Supreme Court who granted a stay of the trial and remanded the matter to this court for briefing, argument, and issuance of an opinion concerning the suppression motion. State v. Hebert, 96-0352 (La.3/22/96); 669 So.2d 1228.
This court received additional briefs from the Defendant and his codefendant Shawn Gaspard, heard oral arguments, and issued an opinion again denying the motion to suppress. State v. Hebert, 95-1645 (La.App. 3 Cir. 6/5/96); 676 So.2d 692, writ denied, 96-1736 (La.10/11/96); 680 So.2d 643.
It is now well-settled that a defendant may once again seek review of a pretrial ruling by the trial court even after the denial of a pretrial supervisory writ application seeking review of the same issue.
The prior denial of supervisory writs does not bar reconsideration of an issue on appeal, nor does it prevent the appellate *68 panel from reaching a different conclusion. State v. Fontenot, 550 So.2d 179 (La.1989); State v. Decuir, 599 So.2d 358 (La.App. 3rd Cir.1992), writ denied, 605 So.2d 1095 (La. 1992). When a defendant does not present any additional evidence on this issue after the pre-trial ruling, the issue can be rejected on appeal. See, e.g., State v. Regan, 601 So.2d 5 (La.App. 3rd Cir.1992), writ denied, 610 So.2d 815 (La.1993); State v. Wright, 564 So.2d 1269 (La.App. 4th Cir. 1989). Judicial efficiency demands that this court accord great deference to its pre-trial decision unless it is apparent that the determination was patently erroneous and produced unjust results. State v. Decuir, supra, at 360.
State v. Magee, 93-643, p. 2 (La.App. 3 Cir. 10/5/94); 643 So.2d 497, 499.
In the present case, the Defendant presented no additional evidence concerning his detention, confession and arrest. There has been no change in the law concerning detention, confessions, and arrests that would alter the outcome of the previous opinion. Thus, we find this court's lengthy ruling in State v. Hebert, 95-1645 (La.App. 3 Cir. 6/5/96); 676 So.2d 692, writ denied, 96-1736 (La. 10/11/96); 680 So.2d 643, controls in this case and we find these assignments of error to be without merit.

ASSIGNMENT OF ERROR NO. 4
By this assignment of error, the Defendant contends that the trial court should not have allowed the State to repetitively display the graphic photographs of the victim.
Photographs are generally admissible if they illustrate any fact, shed any light upon an issue in the case, or are relevant to describe the person, thing or place depicted. State v. Mitchell, 94-2078 (La.5/21/96); 674 So.2d 250. In State v. Bourque[1], 622 So.2d 198 (La.1993), the Louisiana Supreme Court set forth the law concerning admission of graphic postmortem photographs.
The admission of gruesome photographs will not be overturned unless it is clear the prejudicial effect of the photographs outweighs their probative value.... This court will not find that photographs were admitted in error unless they are so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence.... The fact the photographs are gruesome does not, in and of itself, prevent their admissibility....
Postmortem photographs at the scene or autopsy photographs of murder victims are admissible to prove corpus delicti, to provide positive identification of the victim, to corroborate other evidence establishing the cause of death, the manner in which death occurred, and the location, severity, and number of wounds.... This court has held "the defendant cannot deprive the State of the moral force of its case by offering to stipulate to what is shown in photographs....."
Bourque, Id. at 236 (citations omitted).
The Defendant conceded in his appellate brief, "there is no issue as to whether Mitchell Hebert was one of the two persons who killed Jerry Green during the perpetration of an armed robbery." The Defendant further states in brief:
[A]ppellant does not contend that the State should have been precluded from introducing some of the bloody photographs, only that the repetitious nature of the majority of these photographs were introduced for the sole purpose of inflaming the jury. There was absolutely no issue as to the identity of the perpetrators, or the method of death or identity of the victim in the above captioned trial. Statements establishing every element necessary for the *69 state to prove its case was established by the statement of Mitchell Hebert....
The Defendant argues that it was unnecessary for the State to introduce these bloody and repetitious photographs, and that this action had the effect of inflaming the jury, distorting the minds of the jurors and denying the Defendant his right to due process.
In the Bourque case, the court permitted the introduction of graphic and gruesome photographs of the murder scene since these photographs established the struggle that took place before the shootings, the extent of the injuries suffered by the two victims, and the defendant's specific intent to kill.
In the case sub judice, the State first introduced the photographs during the guilt phase of the trial. The first witnesses called were the first persons to arrive at the Green Oaks Lounge after the murder; they testified that the photographs accurately depicted the scene of the murder. Then, the State's expert witnesses used the photographs of the bloody shoe prints in making shoe print comparisons and to show why blood type comparisons were made. The coroner used the photographs to establish the nature and extent of the injuries and the cause of death.
The State had to prove that the Defendant murdered the victim in the course of a robbery. The State contended that the Defendant fought with the victim and the photographs showed signs of a struggle. The photographs also showed that one of the Defendants rifled through the area behind the bar apparently looking for money. The photographs of the injuries to the victim's head established that the severe wounds the victim suffered resulted from the murderer continually striking his upper body and head, and slashing his throat. Finally, the bloody shoe prints surrounding the victim allegedly matched the shoes worn by the Defendant at the time of the crime, thus establishing the identity of the murderer. The graphic photographs also established that the murderer acted with specific intent. As did the court in Bourque, we find no error in the State using the photographs to aid in the proof of its case. Further, we find that the color photographs in the present case are not so gruesome that the jury was overwhelmed and convicted the Defendant without sufficient other evidence.
Therefore we find this assignment of error is without merit.

DECREE
For the reasons assigned, Defendant's conviction and sentence are affirmed. The case is remanded to the district court in order for it to inform the Defendant of the provisions of article 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of this opinion and to file written proof that the Defendant received the notice in the record of the proceedings.
AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] In State v. Comeaux, 93-2729, p. 9 (La.7/1/97): 699 So.2d 16, 21 the Louisiana Supreme Court over-ruled a portion of Bourque not connected with the ruling relied upon herin stating:

The Bourque decision limited the amount of admissible evidence that the prosecutor may introduce in the case-in-chief of the penalty phase, holding that anything beyond "minimal evidence" of the unadjudicated criminal conduct impermissively shifts the focus of the capital sentencing jury from the character and propensities of the defendant to the determination of the guilt or innocence of the defendant with respect to the unadjudicated criminal conduct. On reconsideration, we now overrule the Bourque decision.