NOT DESIGNATED FOR PUBLICATION

## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 08-572

**STATE OF LOUISIANA**

**VERSUS**

**JIMMY MORCHAN TURNER**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NO. 57765
HONORABLE STEPHEN BEASLEY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## OSWALD A. DECUIR
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, and Sylvia R. Cooks and Oswald A. Decuir, Judges.

**Thibodeaux, Chief Judge, concurs in the result and assigns written reasons.**

**Cooks, J., dissents and assigns written reasons.**

**AFFIRMED.**

**Don Burkett**
**District Attorney**
**Clifford R. Strider, III**
**Assistant District Attorney**
**P. O. Box 1557**
**Many, LA 71449**
**(318) 256-6246**
**Counsel for Plaintiff/Appellee:**
    **State of Louisiana**

**G. Paul Marx**
**Louisiana Appellate Project**
**P. O. Box 82389**
**Lafayette, LA 70598-2389**
**(337) 237-2537**
**Counsel for Defendant/Appellant:**
    **Jimmy Morchan Turner**

**DECUIR, Judge.**

The Defendant, Jimmy Morchan Turner, pled guilty to two counts of first degree murder, violations of La.R.S. 14:30.

In exchange, the State agreed to not pursue the death penalty, and the Defendant was sentenced to life imprisonment without benefit of probation, parole or suspension of sentence on both counts, with the sentences ordered to run concurrently.

The Defendant appeals assigning the following assignments of error:

1. The trial court erred in refusing to recuse the District Attorney, where witnesses were interviewed shortly before trial by the prosecution team and pressed to change their original statements, thereby removing the prosecution team from the role of counsel and rendering them part of the investigation and witnesses to the nature, circumstances and content of witness statements given out of court.

2. The trial court erred in that the Defendant did not understand his Miranda Rights and therefore could not knowingly waive them, and therefore the Denial of the Motion to Suppress should have been granted.

## FACTS

The following information was taken from the factual basis given at the guilty plea proceeding: On August 24, 2003, the Defendant went to Hilltop Grocery where he shot and killed the owners, Nancy and Andy Johnson.

## RECUSAL OF DISTRICT ATTORNEY

The Defendant asserts the trial court erred in failing to recuse the District Attorney's Office.

The Defendant filed a pre-trial motion seeking to recuse the Sabine Parish District Attorney's Office. The trial court conducted a hearing and, without giving reasons, denied the Defendant's motion.

The Defendant sought a writ of review by this court, and this court held, "[T]here is no error in the trial court's ruling." *State v. Turner*, an unpublished writ bearing docket number 08-108 (La.App. 3 Cir. 2/6/08).

In *State v. Schmidt*, 99-1412, pp. 38-39 (La.App. 3 Cir. 7/26/00), 771 So.2d 131, 152, *writ denied*, 00-2950 (La. 9/28/01), 798 So.2d 105, *cert. denied*, 535 U.S. 905, 122 S.Ct. 1205 (2002), this court explained, in pertinent part:

> It is well-settled that a defendant may, once again, seek review of a pretrial ruling by the trial court even after the denial of a pretrial supervisory writ application seeking review of the same issue.
>
> The prior denial of supervisory writs does not bar reconsideration of an issue on appeal, nor does it prevent the appellate panel from reaching a different conclusion. *State v. Fontenot*, 550 So.2d 179 (La.1989); *State v. Decuir*, 599 So.2d 358 (La.App. 3rd Cir. 1992), *writ denied*, 605 So.2d 1095 (La.1992). When a defendant does not present any additional evidence on this issue after the pre-trial ruling, the issue can be rejected on appeal. *See*, e.g., *State v. Regan*, 601 So.2d 5 (La.App. 3rd Cir. 1992), *writ denied*, 610 So.2d 815 (La.1993); *State v. Wright*, 564 So.2d 1269 (La.App. 4th Cir. 1989). Judicial efficiency demands that this court accord great deference to its pre-trial decision unless it is apparent that the determination was patently erroneous and produced unjust results. *State v. Decuir*, *supra*, at 360.

*State v. Hebert*, 97-1742, p. 9 (La.App. 3 Cir. 6/3/98); 716 So.2d 63, 67-68, *writ denied*, 98-1813 (La. 11/13/98); 730 So.2d 455, *cert. denied*, 529 U.S. 1072, 120 S.Ct. 1685, 146 L.Ed.2d 492 (2000), *quoting State v. Magee*, 93-643, p. 2 (La.App. 3 Cir. 10/5/94); 643 So.2d 497, 499.

At the hearing on the motion and in his previous brief to this court, the Defendant argued that the prosecutors had injected themselves as investigators and had become witnesses in the case. No new evidence regarding this issue was presented after the pre-trial ruling. Additionally, the appellant's counsel asserts the same grounds in his brief to this court. Accordingly, we will adhere to our pre-trial opinion and deny this assignment of error.

2

The Defendant asserts that the trial court erred in denying the motion to suppress on the grounds that the Defendant did not understand his *Miranda* rights and, therefore, could not have knowingly and intelligently waived them.

The Defendant filed a pre-trial "Motion to Suppress Statements," asserting the statements made to the investigating officers were made without the Defendant's first making a knowing and intelligent waiver. After a hearing on the motion, the trial court denied the motion without giving reasons.

The Defendant, in his statement to the police, never confessed to the murders, but his statement placed him with the prime suspect, John Spencer, on the day of the murders. The Defendant asserts the State failed to establish the voluntariness of his statement because the State failed to offer any evidence to rebut the "scientific" testimony that the Defendant suffered from a mental impairment such that he could not comprehend the *Miranda* warning.

The State argues that the Defendant's IQ of sixty-four or sixty-five, his ability to perform daily activities, that he was previously advised of his *Miranda* rights, that he was advised of his *Miranda* rights at least three times surrounding the current offense, and his attempts to deflect blame from himself in his statement, support the trial court's denial of the motion to suppress. In support of its argument, the State cites *State v. Green*, 94-887 (La. 5/22/95), 655 So.2d 272.

In *Green*, the court of appeal reversed the juvenile's first degree murder conviction, and vacated his life sentence, finding the trial court erred in admitting a confession. The confession made by the defendant to homicide detectives shortly after his arrest was suppressed based upon the trial court's finding that the "defendant's mental retardation" rendered him incapable of making a "knowing and

3

intelligent" waiver of his *Miranda* rights. The supreme court found that the court of appeal rested its ruling solely upon the uncontradicted expert testimony of Dr. Marc Zimmerman, the forensic psychologist. The supreme court held the court of appeal erred, explaining, in pertinent part:

> The court of appeal erred in crediting Dr. Zimmerman's testimony over that of the other evidence presented in this case. We have often noted that expert testimony is not controlling, and that, while helpful, it may be rejected by the trier-of-fact. *State v. Lefevre*, 419 So.2d 862 (La.1982).

*Id*. at 284.

In *State v. Wilson*, 467 So.2d 503, 519 (La.), *cert. denied*, 474 U.S. 911, 106 S.Ct. 281 (1985), the court held:

> A diminished intellectual capacity does not alone vitiate a defendant's ability to make a knowing and intelligent waiver of *Miranda* rights and confess voluntarily; the critical factor is whether defendant was able to understand the rights as explained to him and voluntarily give a statement. *State v. Benoit*, 440 So.2d 129 (La.1983); *State v. Lindsey*, 404 So.2d 466 (La.1981).

At the hearing on the motion to suppress, Arnold C. "Jack" Staton, a detective for Sabine Parish Sheriff's Department, testified he first interviewed the Defendant on August 26, 2003. Although the Defendant was not under arrest at that time, Detective Staton read to the Defendant each of the *Miranda* rights. Detective Staton testified that he asked the Defendant if he understood his rights, and the Defendant stated that he did. The Detective witnessed the Defendant sign the waiver of rights form. It was the Detective's opinion that the Defendant understood his rights and he freely and knowingly waived these rights.

The State introduced into evidence the cassette tape of the August 26, 2003 statement, the signed *Miranda* rights form, and the transcription of the statement into evidence. In this statement, the Defendant admitted that Mr. Johnson, one of the victims, had called the Defendant's mother complaining that the Defendant had sold

4

his daughter drugs, and told the Defendant to stay away from his store. The Defendant stated that as a result he did not go to the victim's store. The Defendant stated that while in his yard at his home, his cousin, Stacy, told him about the murders.

Detective Staton testified an arrest warrant was issued for the Defendant's arrest. The Defendant was arrested and given his *Miranda* rights when he was initially picked up on September 4, 2003. At the station on that same date, Detective Staton read the Defendant all his *Miranda* rights again, which were recorded on video tape. However, the Detective admitted he did not read to the Defendant all of the words contained in the "Waiver of Rights" portion of the *Miranda* form. Specifically, he did not read the words "I do not want a lawyer" and "I understand what my rights are and I elect to waive them." The State introduced into evidence the videotape and the transcription of the videotape. The trial court viewed the videotape.

A review of the videotape indicates Detective Staton read the Defendant all of his *Miranda* rights, and he advised the Defendant to read the "Waiver of Rights" clause on the *Miranda* form. Detective Staton added, referring to this clause, "no threats or promises were made toward you" and that "you are willing to talk to us."

The Detective testified that he did not know whether or not the Defendant could read. However, it was his opinion that the Defendant understood his rights, and he testified that the Defendant was under no duress or threats at the time he waived his rights. Additionally, Detective Staton testified that he was familiar with the Defendant and his family, and that he had arrested the Defendant on a prior occasion.

In the September 4, 2003 statement, the Defendant again stated that Mr. Johnson had told the Defendant's mother that the Defendant was selling drugs to his daughter. Unlike the first statement, the Defendant explained that his cousin John

5

Spencer, who was riding with him on the day of the murder, said that the "old people up on the Hill they look like they were easy to rob." The Defendant stated he told Mr. Spencer he could not do it, and he let Mr. Spencer off at the "barn." The Defendant denied going to the store with Mr. Spencer. According to the Defendant, he turned around and drove the opposite direction from the store. The Defendant stated that Mr. Spencer had a .357 gun with him. The Defendant explained that his cousin, Stacy, told him about the murders while he was in his yard at his house. Repeatedly during this interview, the Defendant denied killing the victims.

Dr. James R. Logan was accepted by the trial court as an expert in psychology, limited intellectual functioning and mental retardation. He testified that he tested the Defendant's IQ, and he scored a sixty-four which indicated a mild range of intellectual impairment. It was Dr. Logan's opinion that the Defendant could not read the waiver of rights on the *Miranda* form. Specifically, Dr. Logan stated, in pertinent part:

> A    . . . I feel very confident that he can not read that section regarding the waiver of Miranda rights. I feel equally confident as a whole that he would not understand the gravity of what he was doing when he waived his Miranda rights. I feel equally confident that probably-- probably are words and concepts in the Miranda rights that he would have a hard time understanding to the degree that the Constitution would want someone to. But if you ask me does he understand this sentence with these words, that causes me some pause because I haven't looked at it piece by piece. But it doesn't seem to be a reach to me that someone with such a well established history not just of a reading disorder. It's broader. It's a deficit in his ability to deal with verbal concepts extending into the 60's from the time he was a little guy until now. Yeah, I think I can say with some degree of confidence that he's going to have a hard time with something like Miranda rights. You asked for my opinion and that's it.

Dr. Logan was of the opinion that the Defendant did not attempt to skew the results of the testing in his favor.

6

However, it was Dr. Logan's opinion that the Defendant could "likely" understand the portions of the *Miranda* rights and waiver which were read aloud to him; but, it would depend on testing the Defendant's ability to specifically understand the rights and waiver clauses which he had not done.

Dr. Logan explained that the Defendant's school records indicated that the Defendant left school in the eighth grade and, while in school, he had scored an IQ of eighty-five. Dr. Logan stated that the Defendant's living skills were within normal limits.

Dr. Victoria Swanson was accepted by the trial court as an expert in psychology, mental retardation, and assessment of students in the school system. In her opinion, the Defendant was mildly mentally retarded, and her testing of the Defendant indicated he had an IQ of sixty-five. Dr. Swanson testified the Defendant's school records indicated the highest reading grade level he reached in school at age fifteen or sixteen was third grade level.

Dr. Swanson conducted testing to determine the reading grade level of the *Miranda* form, and her assessment was that the *Miranda* rights section was at fourth grade, six month reading level, and the *Miranda* waiver of rights section was at a third grade, seven month reading level.

In Dr. Swanson's opinion, the Defendant did not comprehend the *Miranda* rights as read to him, but he may have been able to comprehend them if they had been read with some "interventions." Additionally, it was Dr. Swanson's opinion that the Defendant could not read with accuracy the waiver of rights clause, and if it had been read to him the way it had been on the video, the Defendant could not comprehend it.

Connie Gannon, a registered nurse and nurse practitioner for the DeSoto Parish Sheriff's Department, testified she treated the Defendant while in prison for medical complaints. As part of the process to see her, the Defendant filled out a medical screening questionnaire, setting forth his medical complaint. Ms. Gannon testified she was told the inmate filled out the top portion of the form, gave the form to the jailer, and the jailer gave the form to her. In one such questionnaire, Ms. Gannon explained that the Defendant complained of "real bad chest and back pain." The State introduced this document into evidence. We note that on the top of the form referred to by Ms. Gannon, it appears the Defendant wrote his name, cell number, social security number, date of birth, sex, and date and time of request. Additionally, in the section entitled "Nature of Complaint" was handwritten, "Real bad chest and Back pain." On cross-examination, Ms. Gannon testified she did not know for sure if the Defendant had written his medical complaint, but, based upon other requests she had seen from the Defendant, she did not have reason to question it was written by him. Additionally, the nurse testified that the Defendant was able to tell her and to point to the date on the calender when the pain in his chest started. Ms. Gannon explained that the Defendant was able to answer her questions, and to follow her medical instructions. Ms. Gannon was of the opinion that the Defendant did not appear mentally slow, but average.

Mindy Ramsey, a sergeant with the DeSoto Parish Sheriff's Office, testified she talked to the Defendant daily because the Defendant was taking insulin shots. She explained that she would have the Defendant come to check his blood sugar and take his shots. Ms. Ramsey testified the Defendant administered his own blood sugar tests and his own insulin shots. Ms. Ramsey testified she believed that the Defendant comprehended things she asked or told him, and that he followed instructions well.

8

After reviewing the entire record, we find that looking at the totality of the circumstances, the Defendant knowingly and intelligently waived his *Miranda* rights. The Defendant's school records indicated that he completed school to the eighth grade, and in school, his IQ was tested and he scored an eighty-five. Although the Defendant performed significantly worse when tested by the experts, scoring only a sixty-four or sixty-five, Dr. Logan had no information to show the reason for the decline or a reason to doubt the score from the school testing.

Additionally, the testimony by Ms. Gannon, Ms. Ramsey, and Detective Staton did not support the Defendant's theory that his alleged mental impairment impeded his understanding the *Miranda* rights and waiver. The medical complaint form which was filled out by the Defendant was legible and coherent. Although the defense attorney asserted it could have been written by someone other than the Defendant, the defense did not offer any testimony or evidence to support this assertion.

Ms. Gannon and Ms. Ramsey testified that the Defendant could follow medical instructions well. Detective Staton, who was familiar with the Defendant's family and had previously arrested the Defendant, testified there was nothing in the Defendant's demeanor which caused him to be concerned that the Defendant did not understand his rights.

Moreover, the Defendant was advised multiple times of his *Miranda* rights during his first interview on August 28, 2003, and two times on September 4, 2003. During the first interview, the Defendant indicated he did not want to say anymore. During the second interview, the Defendant deflected the blame from himself, and repeatedly denied killing the victims.

Accordingly, we find the trial court did not err in denying the motion to suppress, and this assignment of error lacks merit.

## DECREE

For the foregoing reasons, the Defendant's convictions and sentences are affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.  Rule 2-16.3, Uniform Rules, Courts of Appeal.

10

STATE OF LOUISIANA

VERSUS

JIMMY MORCHAN TURNER

**THIBODEAUX, Chief Judge, concurring.**

The psychological experts all agree that the Defendant could not by himself read the waiver rights form and would have a "hard time with something like *Miranda* rights." Dr. James Logan, the expert in psychology, who made this observation was also of the opinion that the Defendant did not attempt to skew the results of the testing in his favor. Moreover, Dr. Victoria Swanson, another expert in psychology and mental retardation, opined that the Defendant was mildly mentally retarded, and her testing of the Defendant indicated he had an IQ of sixty-five. His understanding of the *Miranda* waiver of rights section of the form was at a third grade level and his understanding of the *Miranda* rights section was at the fourth grade level. In my view, these expert observations, particularly combined with their testing results, demonstrated a lack of an intelligent and knowing waiver of the Defendant's *Miranda* rights.

However, the State's theory of the case was that the Defendant was the shooter. The main evidence to support this theory was not the statement by the Defendant, but the statement of a witness, John Spencer. In fact, the State refers to the Defendant's statement as showing "glaring inconsistencies." In the statements

given by the Defendant, he repeatedly denied shooting the victim and implicated Mr. Spencer as a shooter. Additionally, the Defendant does not assert that he would not have pled guilty but for the denial of his motion to suppress. While the trial court erred in finding the Defendant's statements were admissible, the State set forth, in my view, a sufficient factual basis to support the guilty plea, excluding those statements made by the Defendant. Thus, any error was harmless.

For the foregoing reasons, I respectfully concur.

# STATE OF LOUISIANA

## COURT OF APPEAL  THIRD CIRCUIT

### 08-572

**STATE OF LOUISIANA**

**VERSUS**

**JIMMY MORCHAN TURNER**

COOKS, J. DISSENT.

I agree with Thibodeaux, J. that defendant's statement should have been suppressed.  However, I disagree that failure to suppress was harmless because defendant failed to assert on appeal he would not have pled guilty.  Defendant reserved his right at the trial level pursuant to *Crosby,* and *Alford,* presumably so because he would not have pled guilty if the Motion To Suppress had not been granted.  Why would he appeal at all, if it was always his intent to plead guilty? Defendant's failure to state the obvious is not a basis to maintain the plea without affording him an opportunity to re-enter it or to face trial on remand.