| iYELVERTON, Judge.
The defendant in this case is Lucretia Shelvin, and the State has charged her with murdering her newborn baby. Defendant filed a motion to suppress two statements given after the death of the baby. The trial judge denied the motions and Lucretia applied for writs. In an unpublished writ disposition, a majority of the panel reversed the ruling of the trial court and ordered the suppression of the two statements in the following language:
*126 WRIT GRANTED AND MADE PEREMPTORY: The trial court erred in denying the motion to suppress the two statements given by the Defendant on May 31,1995, and June 1,1995. The Defendant invoked her right to remain ^silent on more than one occasion on May 31, 1995, and the police failed to scrupulously honor her invocation of that right. Thus, the Defendant’s waiver of her right to remain silent given after she had told the police she did not want to talk to them and after the nurse caring for the Defendant relayed the same message to them, and after the police wore down the Defendant’s resistance, is not valid and the first statement should have been suppressed. We further find that the trial court erred in denying the motion to suppress the second statement of the Defendant given on June 1, 1995, because the Defendant again invoked her right to remain silent, but the police failed to honor the invocation of that right.
Accordingly, the ruling of the trial court denying the motion to suppress both statements is reversed and vacated, and this matter is remanded to the trial court for further proceedings consistent herewith. Decuir, J. dissents, finding no error in the trial court’s ruling.
State v. Shelvin, 98-400 (La.App. 3 Cir. 3/31/98), unpublished.
The State of Louisiana sought supervisory review in the Louisiana Supreme Court. The supreme court granted the writ application and remanded the matter to this court for filing of briefs, oral arguments, and issuance of a full opinion. State v. Shelvin, 98-979 (La.6/5/98); 720 So.2d 1203. The State has submitted to this court its writ application to the Louisiana Supreme Court as its brief; the State did not file a brief when the defendant filed the original writ application in March 1998.
The original two-to-one writ decision of this court was based upon credibility and weight-of-the-evidenee determinations. We believed that the testimony of the disinterested Nurse Dena James on the critical question of whether Lucretia had invoked her right to remain silent had not been given sufficient weight. A different panel (except for the author of this opinion), after having considered additional briefs hand oral arguments, and upon re-examining the totality of the evidence presented at the hearing on the motion to suppress, now concludes that the writ application should be denied.

FACTS

Before daylight on Wednesday morning, May 31, 1995, the 18-year-old defendant, Lucretia Shelvin, gave birth to a baby in the bathroom of her grandmother’s home. The State alleges that the defendant then drowned the baby in the bathtub, placed its body in plastic bags, and hid it under her bed. When the grandmother got up and saw blood, she called the police.
Detective MeCullan Gallien of the Lafayette City Police was the lead investigator. During the course of talking with several of Lucretia’s relatives at her grandmother’s home, Detective Gallien learned that she had been charged as a juvenile and put on probation for the suspicious death of another newborn baby two years earlier in 1993. Detective Gallien felt homicide was a possibility in the present case. The detective called Probation Officer Vanessa Bob, who had supervised Lucretia during her juvenile probation, for assistance. Detective Steven Bergeron was also summoned. Lucretia had been taken to University Medical Center, and the officers went to see her there in the hospital.
Detective Gallien saw Lucretia while she was in an examining room and before she was put in a regular room. Dena James, the hospital nurse caring for Lucretia, informed Detective Gallien that Lucretia had not been given any mind-altering medications.
hLucretia gave two taped oral statements in the hospital, one on May 31, and the other the next day, June 1. She moved to suppress both.

The May 31 Statement

Detective Gallien recorded Lucretia’s first statement at about mid-morning. He testified that she never told him she did not want to talk about the case. She appeared to him to be “very reserved” and quiet. Once the detective went into the examining room with Probation Officer Bob, identified himself, and *127 asked Lucretia if she wanted to talk, she agreed. According to the detective, Lucretia asked that everyone leave the room except Detective Gallien, Probation Officer Bob, and Nurse James. Nurse James was going in and out of the room. The defendant was read the Advice of Rights form between 8:42 a.m. and 8:47 a.m., and she began to give a tape-recorded statement at 9:02 a.m.
Detective Gallien could not recall all that he said to Lucretia during the time he was with her before she gave the statement. He denied he ever told Lucretia that if she told the truth things would go easier: “I can’t remember anything in particular. But I do remember that those are things I do not do.”
Lucretia testified that when the police arrived at the examining room at the hospital and told her they wanted a statement, she told the police she did not want to give a statement, but the police persisted. She also testified that she told the nurse caring for her to tell the police she did not want to give a statement.
Nurse Dena James was the labor and delivery nurse in charge of Lucretia’s postpartum care, and she had been attending the patient all morning. Nurse | sJames recalled that Lucretia was crying and upset when she was first admitted. She remembered that a social worker and a policeman came to the examination room, but she was unable to associate Probation Officer Bob or Detective Gallien either by face or name with those persons. Nurse James could not remember whether any of the officers spoke to her about Lucretia. But she remembered “very clearly” that Lucretia “adamantly said I don’t want to talk about it.” Although she could not remember the order of what was said, it being a very busy unit that morning, she remembered that Lucretia said more than once that she did not want to talk about it, but later she began talking about it. The nurse’s perception was that Lucretia was convinced to talk because “[tjhey encouraged her and told her that if she did tell everything and say what happened and was honest about it, it would be easier for her when she went to trial or however they said that.” Nurse James was present when the May 31 statement was taken. Asked whether she was present for the whole statement, she at first said yes, but later testified she was there at the beginning but could not remember whether she was there at the end. She said that during the statement there were a few people present, but she could not remember who they were or who was doing the questioning.
She summarized her testimony as follows:
„A. She and I spent a good bit of time alone together. As her nurse, I mean, I had to do that. I remember people coming up there and they wanted to question her and question her, and I wouldn’t allow anyone to talk to her at that point. I had to take care of her immediate needs. Um, when we were alone together, she told me, she says, “I don’t want to talk to them.” I told — it was a lady. I don’t know who she was. I don’t know if she was the social worker or a police officer or I don’t remember who she was. But I gave the message that she said and, um, went back in and took care of her. RUm, how it came about, I think they asked me if, after she settled down, if they could try again to talk to her. I said I can ask. I went back in. I told her, I said, “They want to talk to you.” And I remember her saying, “I’ll talk to them, but I don’t want to tell them what happened.” And I said, “Well, that’s you. That’s up to you.” So later they did talk.
Q. So the first time she told you, “Tell them I don’t want to talk to them,” you did that. You told them.
A. I went out and gave the message.
Q. That didn’t end it. They came—
A. No. They wanted to come back in and talk to her later.
Q. They continued to try to get a statement from her — ■
A. Correct.
Q. —after that.
A. The room she and I were in, they were not allowed in there. They could not come in there. And we were in there a good while. After we got her *128 stable, that’s when they asked again to talk to her.
Nurse James recalled that the police were kind; they were not rude, ugly, nor mean to the defendant.
Probation Officer Bob was present when Lucretia gave this statement. She was present at all times during the reading of the Advice of Rights form and the taping of the statement. Probation Officer Bob’s recollection was that Nurse James came into the room during the first statement and sat down.

_[7The June 1 Statement

In her first statement, the defendant said the baby was born breathing, she left it to go clean herself, and when she came back the baby had stopped breathing. She then wrapped the body in plastic bags and put it under her bed.
Later on May 31, 1995, Dr. Emil Laga performed an autopsy and informed Detective Gallien he found water in the lungs and stomach. Detective Gallien went back to see Lucretia the next day, June 1, 1995. He was accompanied by Probation Officer Bob and Detective Bergeron. Ms. Bonnie Carter, Lucretia’s mother, was there. Lucretia had been moved to a hospital room. Nurse James was no longer with her. The officers arrived at the hospital at around noon, and Lucretia gave the second statement an hour later.
According to Detective Gallien, Detective Bergeron and Probation Officer Bob were with him when he asked Lucretia what actually happened. The detective told her about the autopsy results and the fact that water was found in the baby’s stomach and lungs. He told her the first statement was not a sufficient explanation of what actually happened. According to Detective Gallien, Lucretia became scared and sad and cried, and he asked her if she wanted to tell him what actually happened. Lucretia said, “[YJeah,” she did, and asked Probation Officer Bob and Detective Bergeron to leave. Before the actual statement began, everybody except Detective Gallien and Lucretia left the room. Lucretia was upset and crying. It took a while for Lucretia to regain her composure.
When the room was cleared and the actual taped statement began, Lucretia acknowledged, as she had done in the first interview, that Detective Gallien |8had read to her the Advice of Rights form, and that she had read it, signed it, and understood it. At the suppression hearing, she denied that she had been advised of her rights on either occasion, contradicting the testimony of the officers.
Lucretia did not recall asking Detective Bergeron and Probation Officer Bob to leave the room. However, she testified that she again told the police she did not want to talk, but they again kept telling her that it would be easier if she told them what happened because they knew.
Detective Gallien read Lucretia the Advice of Rights form. She also signed a number of Consent to Search forms and forms for release of medical and psychological records. The detective asked Lucretia to tell him what happened, but she did not begin speaking right away; he had to allow her time to regain her composure. In this statement Lucretia confessed to killing the baby.

MOTION TO SUPPRESS

The question of whether the statements of Lucretia are admissible is primarily a weight-of-the-evidence determination. The key issues are whether Lucretia invoked her right to remain silent and, if so, whether the police honored the invocation of that right.
When the trial judge issues a ruling on a defendant’s motion to suppress, the appellate court looks at the totality of the evidence presented at the hearing on the motion. The appellate court should not overturn a trial court’s ruling unless the trial judge’s conclusions are not supported by the evidence or there exists an internal inconsistency in the testimony of the witnesses or a palpable or obvious abuse of [ gdiscretion. State v. Burkhalter, 428 So.2d 449 (La.1983); State v. Rios, 528 So.2d 163 (La.App. 3 Cir.), writ denied, 530 So.2d 83 (La.1988). The admissibility of a confession is a question for the trial judge. His conclusions on credibility and the weight of testimony regarding the voluntariness of a confession for admissibility purposes will not be overturned on appeal *129 unless they are unsupported by the evidence. State v. Gachot, 609 So.2d 269 (La.App. 3 Cir.1992), writ denied, 617 So.2d 1180 (La.), cert. denied, 510 U.S. 980, 114 S.Ct. 478, 126 L.Ed.2d 429 (1993).
Before a confession may be introduced into evidence, the State has the burden of proving that it was given freely and voluntarily and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La.R.S. 15:451; La.Code Crim.P. art. 703(D). In Louisiana the statutorily-mandated test for voluntariness is not whether a confession was induced by improper external forces but whether the confession was free and voluntary. State v. Jackson, 381 So.2d 485 (La.1980). The State has the burden of affirmatively proving that the confession was free and voluntary. La.R.S. 15:451; Article 703(D).
The rule set forth by La.R.S. 15:451 complements the ule of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Edüd 694 (1966); that is, that a condition precedent to obtaining a statement admissible in court from a suspect in police custody is that the suspect be informed that he has the right to remain silent and to consult with an attorney. “Miranda also made it clear that for such a statement to be admissible it must be made with a knowing and intelligent waiver of those rights.” State v. Green, 94-0887, p. 10 (La.5/22/95); 655 So.2d 272, 280. Miranda waivers may be either explicit or implicit, North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); State v. Harvill, 403 So.2d 706 (La.1981), and then-validity turns on the totality of the circumstances surrounding the statement. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286.
If a suspect invokes the right to remain silent, then the interrogation by the police must cease immediately. If a suspect invokes his right to remain silent, there is no permanent bar to the police reinitiating contact with the suspect. A defendant who asserts his right to remain silent does not create a per se proscription of an indefinite duration upon further custodial interrogation. Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). The question depends on the totality of the circumstances involved under the particular facts of each case. Among the factors to be considered are: 1) who initiates the further questioning; 2) the time delay between the original request and subsequent interrogation; 3) whether Miranda warnings were given before each separate interrogation; 4) whether Waiver of Rights forms were signed; and 5) whether or not pressures were asserted on the accused by the police between the time he invoked his right and the subsequent interrogation. State v. Brooks, 505 So.2d 714, 722 (La.), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). The invocation of one of the Miranda rights must be unambiguous; however, there are no magic words that need to be spoken. State v. Gaspard, 96-1279 (La.App. 3 Cir. 2/11/98); 709 So.2d 213.
In the ease of State v. Hebert, 95-1645 (La.App. 3 Cir. 6/5/96); 676 So.2d 692, writ denied, 96-1736 (La.10/11/96); 680 So.2d 643, the defendant told one detective he did not want to talk about incriminating evidence the police had found, but later, the defendant confessed after talking to another detective. This court found the | nconfession admissible after considering the five factors set forth in Brooks, 505 So.2d 714.
In the present case Lucretia testified that, before each statement, she invoked her desire to remain silent. She even denied that she had been given her rights. This is contrary to what she said in the statements themselves. It is also contrary to the testimony of the officers; they testified that once they asked her if she was willing to talk about.it, she said that she was. The trial judge believed the testimony of the officers.
The difficulty with the review of this case is the testimony of Nurse James. Nurse James is seemingly disinterested, and her testimony begs attention because it forcefully supports Lucretia’s insistence that she had invoked her right to remain silent. The nurse declared that she remembered “very clearly” that Lucretia “adamantly” said “I don’t want to talk about it.” Nevertheless, a thorough study of her testimony reveals that Nurse James may never have witnessed Lu *130 cretia telling the officers she did not want to talk about the case. This is certainly true with regard to the second statement given on June 1 when Nurse James was not present at all. The trial judge could reasonably have so construed her testimony with regard to the first statement of May 31.
Although Nurse James testified that her memory of events was clear, her memory was not actually so clear. She could not remember the names or faces of the officers present, how many there were, or who did the questioning. She admitted not being able to remember the order of events. Her recollection of whether she was present throughout the entirety of the May 31 statement was not very good. As she Instated, her prime responsibility was to her patient. She first had to stabilize the patient, and to accomplish this, she kept the police at bay until she was satisfied that the patient was able to confront them. A reading of her testimony suggests a good possibility that Lucretia’s expressed reticence to talk was in conversations with Nurse James alone. It was Nurse James, not Lucretia, who told the police Lucretia was not ready to see them. One view of the evidence renders the testimony of Nurse James and that of Detective Gallien totally reconcilable.
Considering the totality of the circumstances and all of the testimony in the record, we are unable to say that the trial judge committed error in the weight he assigned to Nurse James’ testimony. His conclusions on credibility and the weight of testimony regarding the voluntariness of the confessions are supported by the evidence. The State met its burden of proof that the statements were free and voluntary.
WRIT DENIED.
AMY, J., concurs in the result.