571 So.2d 145 (1990)
STATE of Louisiana
v.
Perry Leo SIMMS.
No. 90-K-0074.
Supreme Court of Louisiana.
December 3, 1990.
*146 Edward James Lopez, for Perry Leo Simms, defendant-applicant.
Morgan J. Goudeau, III, Dist. Atty., David Miller, for State of La., plaintiff-respondent.
LEMMON, Justice[*].
In defendant's application to review his conviction of second degree murder, the issue which prompted this court's grant of certiorari is whether defendant's confession should have been suppressed as the product of an illegal arrest which was not supported by probable cause.
On the evening of July 31, 1987, Mary Robertson (the twenty-one-year old murder victim) returned home from work at about 10:00 p.m. Shortly thereafter Mary walked across the street to defendant's home to answer a telephone call, because the Robertsons did not have a telephone and Mary and her sister regularly received their telephone calls at the Simms' home. Mary *147 returned a few minutes later and retired for the night.
Around midnight John Robertson, Mary's father, was awakened by a knock at the kitchen door. He then saw Mary pass his bedroom door wearing a shirt and gym shorts. He overheard parts of a conversation between Mary and the unknown visitor who apparently informed Mary that there was a telephone call for her sister from McDonald's, where both Mary and her sister worked. Mary stated that she was puzzled about the call because her sister was scheduled to go to work at 5:00 a.m. Robertson then heard Mary walk with bare feet out of the house and down the driveway toward the Simms' house. Assuming that Mary was going across the street to the Simms' house to answer the phone call, Robertson soon fell back asleep.
When Robertson awoke again about 2:00 a.m., he noticed that the kitchen door was still ajar and the kitchen light was still lit. Realizing that Mary had not returned, he woke his wife and his other daughter, and they went to the Simms' house to search for Mary. Defendant's brother, who was just returning home for the night, met the Robertsons at the door. After checking inside the house, defendant's brother reported that Mary was not there and that defendant, the only person in the house, was asleep in bed. Robertson then briefly searched the neighborhood without success. Believing that his daughter would not have voluntarily left the neighborhood under such circumstances, he reported to the police that she was missing.
Later that morning, defendant's mother called the police because she was disturbed about Mary's disappearance. She advised the police that she had found a bed sheet containing two small blood stains folded in her daughter's bedroom closet and that the sheet had been on her daughter's bed when she went out the previous evening. She also told the police that her grandchild had found a pearl earring, identical to the type always worn by Mary, on the floor of her daughter's bedroom, next to the closet where the sheet was found. She further related that everyone in her household except defendant had gone out the previous evening and that the washing machine containing defendant's clothes was running when she returned home after 2:00 a.m.
Suspecting foul play, the police went to the Simms' residence to investigate. They asked defendant to accompany them to the police station for questioning, and defendant consented. Defendant's sister accompanied him to the station and waited in the lobby.
Taking defendant into an office, the police advised him of his constitutional right against self-incrimination, obtained his signature on a "waiver of rights" form, and questioned him for about one hour. Defendant denied any involvement in Mary's disappearance, but when he voluntarily lifted his shirt in compliance with the officers' request to check for cuts and scratches, he was unable to explain a fresh scratch on his back.
Defendant was then placed in the locked "bonding room", a place in the jail facility where inmates were allowed to visit with family and to talk to bail bondsmen. The police left the station about 5:00 p.m. to conduct further investigations, but developed no additional information in the next three to four hours.
Defendant's mother, concerned about her son, went to the jail at 11:00 p.m. to check on him. She was told that he was being detained and that she could not speak with him then.
About 12:30 a.m., two new detectives awoke defendant and questioned him for about ten minutes. Defendant stated that he was too tired to talk.
About 1:00 a.m. one of the original investigating officers went into the bonding room and began another questioning session. After defendant talked about his personal life for about an hour and a half, he stated he was ready to talk. He then confessed to having lured the victim to his home and strangling her on his sister's bed until she bled from her nose. After daylight he led the officers to the victim's body, which he had hidden in a septic tank near his house.
*148 Upon being indicted, defendant moved to suppress the confession, but his motion was denied. At trial the confession was admitted into evidence, and the jury returned a verdict of guilty of second degree murder.
The court of appeal affirmed. 554 So.2d 757. The court determined that defendant was under arrest at least by the time he was locked in the bonding room, at which point the officers did not have probable cause to arrest him. In reaching the decision on lack of probable cause and the consequent illegality of the arrest, the court placed great emphasis on the statement of one officer that the police "did not even know that a crime had been committed" until defendant confessed. Id. at 761. Nevertheless, the court held that the confession was admissible because it was voluntarily given and was sufficiently attenuated from the illegal arrest so that it was purged of the taint of the illegal arrest.
We granted certiorari. 559 So.2d 1382. In granting defendant's application, we were particularly concerned about the intermediate court's conclusion that defendant's confession was sufficiently attenuated from the arrest which was found by that court to be illegal. Upon reviewing the record, however, we conclude that the arrest was supported by probable cause. Accordingly, we conclude that the voluntary confession followed a valid arrest and that the motion to suppress the confession was properly denied. It is therefore unnecessary for us to reach the attenuation issue.
On the threshold issue of the point at which the arrest occurred, the court of appeal correctly reasoned that the initial voluntary interview at the stationhouse turned into an arrest prior to defendant's confession. An arrest occurs when the circumstances indicate an intent by the police to effect an extended restraint on the liberty of the accused, rather than at the precise time the officer tells the accused he is under arrest. La.Code Crim.Proc. art. 201; State v. Rebstock, 418 So.2d 1306 (La.1982). The Supreme Court has emphasized that "any assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account `all the circumstances surrounding the incident' in each individual case". Michigan v. Chesternut, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (quoting INS v. Delgado, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), and United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). A seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave". Id. 486 U.S. at 572, 108 S.Ct. at 1978.
In the present case defendant was not formally arrested until after he gave his confession. Nevertheless, an arrest occurred when defendant was placed in the locked bonding room and the officers left to conduct further investigation. The bonding room was a secured facility controlled by electronic locks, and defendant was not free to walk out of the room at any time. Furthermore, Detective Ortego testified that after the initial questioning he informed defendant that he "needed" him to stay in the bonding room, where he would be "held" pending further investigation. At that point a reasonable person would have believed he was not free to leave.
Having determined that defendant was under arrest when he was placed in the locked bonding room and informed he was needed for questioning, we now consider the question whether the police at that point had the necessary probable cause to arrest defendant.
Probable cause to arrest exists when the facts and circumstances within the officer's knowledge are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); State v. Wilson, 467 So.2d 503 (La.1985). The determination of probable cause, although requiring something more than bare suspicion, does not require evidence sufficient to support a conviction. Probable cause, as the very name implies, deals with probabilities. Brinegar v. United *149 States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). The determination of probable cause, unlike the determination of guilt at trial, does not require the fine resolution of conflicting evidence that a reasonable doubt or even a preponderance standard demands, and credibility determinations are seldom crucial in deciding whether the available evidence supports a reasonable belief that the person to be arrested has committed a crime. Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); State v. Rodrigue, 437 So.2d 830 (La.1983). The determination of probable cause involves factual and practical considerations of everyday life on which average men, and particularly average police officers, can be expected to act. State v. Ogden and Geraghty, 391 So.2d 434 (La.1980).
The totality of the information known to the police at the time of the arrest in this case was sufficient to justify a man of ordinary caution in believing defendant had committed a crime upon Mary Robertson. The police knew the following facts: the victim was missing; the victim and her sister regularly received telephone calls at defendant's residence; the victim was told by a visitor around midnight that there was a telephone call for her sister; the victim left her home, apparently expecting to return immediately because she wore no shoes and left the door ajar and the kitchen light burning; defendant was the only person at the Simms' residence during the evening; a bloodstained sheet and an earring of the type always worn by the victim were found in defendant's residence; defendant's clothes were washing in the machine about 2:00 a.m.; and defendant had a fresh scratch on his back that he could not explain. Additionally, the police were aware of defendant's mother's belief that something suspicious had occurred at her home in her absence and of the victim's father's belief that his daughter would not have left the neighborhood voluntarily under these circumstances.
Each fact known to the police at the time of the arrest, when viewed alone, might be explained consistently with innocence. However, probable cause will not be defeated simply because innocent explanations for an activity can be imagined. 1 W. LaFave, Search and Seizure § 3.2(e) (1987). Probable cause exists if a "succession of superficially innocent events had proceeded to the point where a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one". Id.
Furthermore, the officer's statement that the police did not know, at the time defendant was placed in the bonding room, that a crime had been committed must be taken in context to mean they had no certain knowledge of the victim's abduction and murder, such as the finding of a body or the report of a witness to the crime. It is not a prerequisite for the existence of probable cause that the police know at the time of the arrest that a particular crime has definitely been committed. State v. Collins, 378 So.2d 928 (La.1979); State v. Drott, 412 So.2d 984 (La.1982). Although certainty of knowledge of the commission of a particular crime is frequently an important factor in the determination of probable cause, probable cause may exist when the commission of a crime has not been definitely established, but is reasonably probable under the totality of the known circumstances.
On the basis of the totality of the circumstances known to the police officers in the present case at the time defendant was placed in the bonding room, they had ample grounds to justify a belief that defendant had committed a crime in which Mary Robertson was the victim, although the precise crime could not then be determined from the available facts. Since probable cause existed for defendant's arrest, the trial court properly refused to suppress the subsequent confession as the fruit of an illegal arrest.
The conviction and sentence are affirmed.
CALOGERO, C.J., dissents and assigns reasons.
*150 DENNIS, J., dissents. The officers had reasonable cause to suspect but not probable cause to arrest the defendant.
CALOGERO, Chief Justice, dissenting.
I voted to grant writs in this case, accepting the court of appeal's finding that no probable cause existed to arrest the defendant, but disagreeing with that court's conclusion that defendant's voluntary confession was sufficiently attenuated from the illegal arrest to purge the confession of that primary taint. The majority of this court has determined that probable cause indeed existed in this case, pretermitting discussion of the attenuation issue. It is from the majority's finding of probable cause that I respectfully dissent.
I agree with the court of appeal that the St. Landry Sheriff's Office lacked probable cause to arrest the defendant before he gave his confession. When the police know that a crime has been committed, they need have only reasonably trustworthy information that would justify a man of ordinary caution in the belief that the person to be arrested has committed a crime. State v. Ruffin, 448 So.2d 1274 (La.1984). When the police do not know that a crime has been committed, however, "more and better evidence is needed to prove that probable cause exists for the arrest...." State v. Mosley, 390 So.2d 1302 (La.1980); State v. Collins, 378 So.2d 928 (La.1979); State v. Johnson, 363 So.2d 684 (La.1978).
The police in this case freely conceded at the suppression hearing that they did not know that a crime had been committed until defendant confessed on the morning of August 2, 1987. Accordingly, "more and better evidence" was required to establish probable cause for the arrest. In this case, the police had little more than the intuition of defendant's mother that "something" had occurred at her home in her absence, and the confidence of the victim's father that his daughter normally would not have failed to return home that morning after apparently taking a telephone call across the street at the Simms residence. The experienced investigating officers discounted at the scene the evidentiary significance of the spotted sheet and pearl earring, and further found no other evidence that any crime of violence had taken place at the Simms residence. The subjective belief of an individual officer that he lacked probable cause to arrest the defendant coupled with the collective knowledge of all of the officers investigating Tina's disappearance fell short of probable cause to believe that a crime had been committed and that defendant committed it. Accordingly, I find that an illegal arrest occurred.
While the rest of what I say in this dissent may be dicta, I choose to address my views regarding the attentuation issue which this court has obviated by finding probable cause to arrest. Defendant's confession was not sufficiently attenuated from the illegal arrest to purge the confession of that primary taint. Considerations in determining attentuation are the temporal proximity of the arrest to the confession, the presence of intervening circumstances, and the purpose and flagrance of the official misconduct. Brown v. Illinois, 422 U.S. 590, 603-4, 95 S.Ct. 2254, 2261-62, 45 L.Ed.2d 416 (1975); State v. Scott, 389 So.2d 1285, 1288 (La.1980). The relevant question is whether the police "came at" the confession by exploitation of the primary illegality (the illegal arrest), or whether the statement was "sufficiently an act of free will to purge the primary taint." Brown v. Illinois, 422 U.S. at 599-602, 95 S.Ct. at 2259-2261 (quoting Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441). A lengthy incarceration cannot be used as a factor in favor of admitting a confession when that incarceration is being utilized as a vehicle for obtaining an inculpatory statement.
On this record, I think that it is clear that the police "came at" defendant's statement by exploiting the continued detention of the defendant in the bonding room, and not by a means sufficiently independent to break the causal connection between the illegal detention and the subsequent statement. See, Dunaway v. New York, 442 U.S. 200, 218, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979).
*151-161 The absence of probable cause to arrest the defendant and the lack of sufficient attentuation to purge defendant's subsequent confession of the illegal arrest would prompt me to reverse in part the court of appeal opinion, reverse defendant's conviction and order a new trial.
[EDITOR'S NOTE:]
NOTES
[*] Judge Melvin A. Shortess of the Court of Appeal, First Circuit, participated in this decision as Associate Justice Pro Tempore.