hWALTZER, Judge.
The defendant, George Diaz, appeals his conviction and sentence for burglary, argu *1092 ing that the trial court erred in failing to suppress the confession.

STATEMENT OF THE CASE

On 14 September 1999, Diaz was charged with simple burglary. On 17 September 1999, Diaz was arraigned and entered a plea of not guilty. On 8 October 1999, the trial court denied defendant’s motion to suppress the confession. On 18 November 1999, following a judge trial, Diaz was found guilty as charged. On 9 December 1999, he was sentenced to serve eight years at hard labor with credit for time served. On 7 January 2000, Diaz pled guilty to the multiple bill. Defendant’s original sentence was vacated and defendant was re-sentenced as a multiple offender to serve eight years at hard labor with credit for time served.

STATEMENT OF THE FACTS

Testimony taken during the Motion to Suppress the Confession conducted on 8 October 1999:

Detective Walter Gifford testified that he is a detective with the New Orleans Police Department. He was assigned to the Second District in July, 1999. He stated that he conducted a follow-up investigation of a burglary that occurred at |21039/é Broadway Street. This address is the Boot Grocery Store. He stated that the original investigating officer had confiscated a surveillance videotape showing the perpetrator entering and leaving the store. He testified that he viewed the tape but was unable to recognize the person on the tape. The tape showed that the perpetrator entered through the front glass door which was broken. The owner of the store was unable to provide an identification of the perpetrator. The manager of the store, however, identified the perpetrator to be Diaz. Detective Gifford testified that some cigarettes were stolen during the burglary. He later learned the identity and address of the perpetrator as Diaz. He stated he spoke to Diaz at his residence and informed him that he was a suspect in the burglary. He testified that he informed Diaz of his Miranda rights. Diaz stated that he understood those rights. Diaz identified himself as the perpetrator and admitted that he had committed the burglary.
On cross-examination, Detective Gifford testified that when the owners of the store first viewed the video tape they stated that they recognized the perpetrator as someone they knew from the neighborhood as “Jose George” who often frequented the Boot Bar, the grocery store and the pizza place outside of the store. Detective Gifford also stated that he spoke to the manager of Dino’s Pizza which is located outside of the Boot bar and store. The manager of Dino’s also identified the defendant from the videotape. Following these interviews Detective Gifford stated that he received a telephone call during which he received information as to the defendant’s address and telephone number. However, he still did not have the defendant’s last name. He stated that he went to the address given to him and when Diaz opened the door Gifford recognized him as the suspect he observed on the surveillance videotape. He identified himself as a police officer, informed Diaz |aof his rights and asked the defendant to get dressed and accompany him to his office to obtain a statement from him. The defendant complied. At Detective Gifford’s office Diaz signed a waiver of rights form. He stated that the defendant gave a written statement of the circumstances surrounding the burglary and his participation in the crime. He stated that when he transported Diaz to his office that the defendant was not handcuffed and was not under arrest. He testified that Diaz was not under the influence of drugs or alcohol at the time he gave the statement. *1093 In his statement Diaz admitted to being under the influence of drugs and alcohol at the time of the burglary. After giving the statement, Diaz was placed under arrest. Subsequently, after speaking to the district attorney, Detective Gifford arrested and booked Diaz on one additional count of burglary and one count of aggravated arson. Detective Gifford stated that no one else was arrested for these crimes. Following Detective Gifford’s testimony, the district court found probable cause for the defendant’s arrest and denied the motion to suppress the confession.

Testimony taken during the defendant’s trial conducted on 18 November 1999:

Charles Napoli testified that he is the owner of two businesses located on Broadway Street, The Boot and Waldo’s. He stated that The Boot is located at the corner of Broadway and Zimple Streets. Napoli testified that the business is a combination bar and convenience store. The bar section is located on Broadway. Located behind the bar is the convenience store. The convenience store can be entered either from Zimple Street or from Broadway through the bar section. The bar entrance consists of double glass doors; one is operable and the other is fixed. Inside the bar a solid wooden door separates the bar from the convenience store. Napoli stated that on 21 July 1999 he arrived at the business at approximately 8:00 |4a.m. He observed that one of the doors had been boarded up. When he entered the building he found a note written by his manager informing him that there had been a break-in the night before and that the surveillance videotape had been left for him to view. Napoli testified that he took the videotape, went into the office and viewed the tape. He stated that the tape showed that while the bar was still open the convenience store had already been closed. He saw that the door on the Zimple Street side had been broken and that someone had crawled in through the bottom of the door. The intruder walked through the convenience store as if he was shopping. The tape then showed that the intruder walked behind the counter and attempted to open the cash register by striking it several times with a bottle. He was not successful. The intruder then grabbed a paper sack and filled it with cartons of cigarettes. The intruder then left the store. Napoli stated that after viewing the tape he contacted the New Orleans Police Department. The police arrived and picked up the tape. They also noticed that there were some burned bags on a charred area behind the counter. The police viewed the tape again and observed the perpetrator enter the store a second time, approximately thirty to thirty-five minutes after he entered the first time. The perpetrator took a liquor bottle from the shelf, broke it on the floor and proceeded to light the contents which resulted in a fire. The perpetrator then exited the store. Napoli opined that the fire probably extinguished itself without causing considerable damage because the fire was started on some metal shelving behind a fireproof wall.[1] Napoli testified that the tape showed that the intruder entered the store at about 2:07 a.m. | sHe testified that he did not know the intruder and did not give him permission to enter the store.
On cross-examination, Napoli testified that he was not present at the time of the burglary. He stated that his only knowledge of the burglary came from what he saw on the videotape and what his employees told him. He stated that he had not seen Diaz before the day of trial and that *1094 he had never seen the alleged intruder observed on the tape. He testified that he never identified Diaz as the intruder that burglarized the store.
Edmond Gueydan testified that he is the general manager of The Boot bar and The Boot convenience store. He stated that he has been employed for three years by Charles and Craig Napoli. He testified that on 21 July 1999 he was collecting the cover charge at the front door of the bar. He stated that Diaz was drinking in the bar at that time. He testified that he knew Diaz and had seen him in the bar on multiple occasions for several years. He stated that Diaz frequents the bar on a weekly basis during the summer. He testified that on that day a drink special had been run. When the special ended around 2 a.m. he went behind the bar. He then made the last call for drinks. He observed Diaz near the pool tables. Diaz left the bar with the other patrons at that time. Gueydan testified that about ten minutes after the last call he entered the convenience store to “Zee-out” the cash register because the business was closing. While in the convenience store, Gueydan stated that he smelled an awful odor and noticed that the glass door had been broken. He then summoned the other employees because he was concerned about what had transpired and that there might be a fire somewhere in the store. The employees checked around the premises and did not see a fire. Gueydan then viewed the videotape and was able to identify Diaz as the person who had entered |fithe store. He testified that on the night in question he asked Diaz to leave the bar because it was closing. Ten minutes after Diaz left the bar, he broke into the store. Diaz was wearing a white tee shirt with a small emblem on the chest and shorts. He not only remembered the defendant’s clothing but also his hairstyle and general build. Gueydan stated that he remembered what Diaz looked like that night because he had been around him for at least six or seven hours prior to the burglary. He testified that he viewed the videotape with his employer and later viewed it with Detective Gifford. After speaking with the manager of the pizza restaurant, Gueydan was able to secure a name and an address for Diaz which he gave to Detective Gifford. Guey-dan positively identified Diaz in court as the person he saw on the video surveillance tape burglarizing the store.
On cross-examination, Gueydan testified that he was not present in the store when the burglary occurred. He stated that he was in the building but not in the store. He testified that Diaz had been a customer of the store during the three years that he was employed there. He stated that he never had major problems with Diaz but did have some occasional minor problems when he could not allow Diaz inside the bar because the defendant was not carrying any identification. Diaz would argue with him that he was old enough to enter the bar. Gueydan testified that he saw Diaz ten minutes before he closed the bar and that the store had been closed for two hours. He testified that he took the cover charge from Diaz that night, that he got a good look at him, was around him for the majority of the night and had three or four contacts with him that evening. He stated that when he saw the intruder on the videotape he immediately recognized the person as the defendant who went by the name of “George” or “Jorge” and was also known at the pizza restaurant. After some inquiries he was able to secure the defendant’s name and |7address. He stated that there was no doubt in his mind that Diaz was the person who burglarized the store.
On re-direct examination, Gueydan testified that he was positive that Diaz burglar *1095 ized the store and had been seen in the bar earlier that night.
Detective Walter Gifford testified that on 21 July 1999 he was employed as a detective with the New Orleans Police Department. He conducted a follow-up investigation of a burglary of The Boot grocery store. He stated that the original investigating officer who took the call had confiscated the surveillance videotape and entered it as evidence. He stated that he conducted the follow-up investigation of the suspect who was seen on the tape. He interviewed Gueydan, the manager of the store, and Napoli, the owner. They all viewed the videotape. Napoli was unable to identify the suspect. Gueydan identified the suspect as a person who frequented the bar, the store and the pizza restaurant. Gueydan told him the suspect went by the name of “Jose” or “George”. Later that evening, Gifford testified that he received a telephone call during which he was given an address of 7309 Freret Street as that of the suspect. He then attempted to contact the manager of Dino’s Pizza, Mr. Locascio. Dino’s is located outside The Boot. He made arrangements for Locascio to view the tape. Lo-cascio identified the suspect as someone he knew as “George”.
Gifford testified that he went to the suspect’s address and knocked on the door. When Diaz opened the door, Gifford immediately recognized him as the suspect on the tape. He requested that Diaz get dressed and accompany him to his office, and Diaz complied. Once at the police office, Gifford informed Diaz of his rights. Diaz answered that he understood his rights. Diaz then admitted that he had committed the burglary and agreed to sign a typed written statement to that ^effect. Detective Gifford testified that in addition to informing Diaz of his rights before he gave the statement, Diaz signed a waiver of rights form before giving the written statement. Detective Gifford positively identified the waiver of rights form signed by Diaz which was entered into evidence. Detective Gifford positively identified the typed written statement signed and initialed by Diaz as the typed written statement taken by him. Gifford testified that in the statement Diaz admitted to entering the store, stealing some cigarettes, leaving the store and giving the cigarettes to two other men waiting outside the store. Diaz did not admit that he entered the store a second or third time.
On cross-examination, Gifford testified that the original officer who arrived at the burglary scene was Mike Dalparez. Gif-ford stated that he did not conduct the initial investigation but only the follow-up investigation. He stated that he spoke to Diaz for about fifteen minutes before taking the written statement from him. He stated that Diaz spoke good English and understood the conversation. He stated that he informed Diaz before he made the statement that he was a suspect in the burglary and that he had been identified on the videotape. Gifford stated that Diaz told him that he was with some other people when the incident occurred and that someone else had broken the glass door. Gifford testified that he attempted to locate the alleged other people involved but was unable to do so. He stated that he did not coerce or threaten Diaz to make the statement and that the statement was completely voluntary. After the statement was typed he gave it to Diaz who read the statement, signed it and initialed each page.
George Diaz, the defendant, testified in his own behalf. Diaz stated that he resides at 7309 Freret Street. He stated that on 21 July 1999 at around 5 p.m. he arrived at The Boot to drink a few beers with some friends who work at Dino’s *1096 | flPizza. He stated the bar was offering drink specials of fifty cents per drink for a five-dollar cover charge from 9 p.m. to 11 p.m. He testified that when he attempted to enter the bar he was told that he needed identification to enter. Because he had no identification he stood outside the bar and drank beer with his friends. Later that night at around 11:30 p.m. he went home. He admitted both that he returned to the bar that same evening and that a few days later on 3 August 1999 he was arrested. He testified that on 3 August 1999 he heard a knock on his door. When he answered the door a man (Detective Gifford) said “F.B.I.” and stated that he was looking for “Jose”. He informed Detective Gifford that “Jose” was his stepfather. Detective Gifford then asked him who he was, and he responded, “Why do you want to know my name?” Detective Gifford then asked if he had identification to which he responded that he did not have identification. He stated that Detective Gifford again asked him his name. He again asked Detective Gifford why he wanted to know his name. Detective Gif-ford then asked if he could talk to him. He asked Detective Gifford what he wanted to talk to him about. Detective Gifford then asked him if his name was “Jose”. Diaz responded that was his stepfather’s name. Detective Gifford then came into the house. Diaz testified that he had a towel around him because he had just stepped out of the shower. Detective Gif-ford told him to get dressed. Diaz stated that he asked why and Detective Gifford responded, “I am going to take you with me”. He then asked Detective Gifford if he had a warrant for his arrest. Detective Gifford responded that he did not have a warrant but that Diaz had to come with him. Diaz stated that he told Detective Gifford that without a warrant he did not have to go with him and that he needed to contact his mother and stepfather on their cell phone. Detective Gifford then told him that if he did not go with him that he Imwould handcuff him and “bring him to the police station.” Diaz stated that Detective Gifford told him that someone broke into The Boot store. He also stated that earlier Detective Gifford told him that he had been seen on the videotape. He denied telling Detective Gifford that he entered the store. He stated that he asked Detective Gifford why he was taking him if he asked for his stepfather. Detective Gif-ford responded that he was not “sure but I need to talk to you”. Detective Gifford then took Diaz to the police station. At the police station Detective Gifford told him that he was going to do something for him, he was going to charge him with simple burglary because he saw him on the videotape. Diaz testified that he asked to see the videotape but was refused. Detective Gifford then began to question the defendant. Diaz stated that he did not answer the questions. Detective Gifford then told him that he better cooperate because it was him on the videotape. Diaz denied that he was on the videotape. He admitted to going to the store twice earlier in the day to buy a six pack of beer and a pack of Marlboro. He told the man that those occasions would be the only times that he was seen in the videotape. He admitted to a burglary and stolen auto conviction in 1987 when he was seventeen years old. He also admitted to a recent charge of car theft.
On cross-examination, Diaz stated that he lives one-half block from The Boot store and patronized the store often. He admitted to being in The Boot bar on the night in question. He stated that he was playing pool. He testified that when he left the bar was still open because he did not leave at the last call. He admitted that he signed the written statement after Detective Gifford told him that he was seen on *1097 the videotape and that he did commit the burglary. He denied signing the statement in front of Detective Gifford. He stated that he was already inside The Boot bar playing pool when everyone was asked to leave because the drink special |nwas starting at 9 p.m. He went outside and tried to reenter the bar but was refused because he had no identification. He stated that he told the man at the door that he had been inside drinking and that he was old enough to drink. The man still refused to allow him to enter so he stood outside and drank beer with his friends and then went home. He admitted that he was wearing a white tee-shirt and that he understood English. He denied that he read the written statement before he signed it. He denied telling Detective Gifford about his friends James and Michael who were the Tulane students that he was drinking with that night and to whom he gave the cigarettes that he took from the store. Diaz denied all the facts given in the written statement.
On re-direct examination Diaz stated that he understood everything that Detective Gifford told him but he denied telling Detective Gifford that he burglarized the store. He stated that it was Detective Gifford who told him that he was seen on the tape in the store at the time of the burglary. Detective Gifford told him “You don’t get another choice to turn yourself in because you did it.” He then testified that he responded to Detective Gifford, “Well, if you say that, you know, that’s cool, you know.”

ERRORS PATENT

A review for errors patent reveals that there are none.

DISCUSSION

Diaz asserts that the state failed to carry its burden of proof that his written statement was not the fruit of an illegal arrest. Specifically, Diaz argues that the sketchy circumstances surrounding the encounter between Detective Gifford and the defendant at the defendant’s home raises the question of whether an arrest occurred at the defendant’s home before he was transported to the police station. |1gDiaz contends that if an arrest occurred at his home, it was an illegal arrest because it was effected without a warrant and in the absence of exigency. The result of an illegal arrest would be the suppression of the confession given by Diaz at the police station.
A reviewing court may consider the evidence presented at trial in addition to the evidence presented at the hearing on the motion to suppress. State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272. When supported by the evidence, a trial judge’s ruling on a motion to suppress a confession is entitled to deference. State v. Carter, 94-2859 (La.11/27/95), 664 So.2d 367.
In State v. Allen, 95-1754 (La.9/5/96), 682 So.2d 713, the Louisiana Supreme Court addressed the issue of what constitutes an arrest. The court stated:
La.C.Cr.P. art. 201 defines arrest as “the taking of one person into custody by another ... [by] actual restraint of the person.” In distinguishing between an investigatory stop and an arrest, courts have considered numerous factors. In Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the United States Supreme Court found a stop for questioning was indistinguishable from a traditional arrest because the suspect was not questioned briefly where he was but transported to the police station, was never informed he was free to go and, in fact, would have been restrained had he tried to leave. The United States Supreme Court in Michigan v. Chesternut, 486 U.S. 567, 574, 108 S.Ct. 1975, 1979, 100 *1098 L.Ed.2d 565 (1988) (quoting INS v. Delgado, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)) stated that “any assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account all of the circumstances surrounding the incident in each individual case.” The Menden-hall Court also stated that in determining whether a person has been seized under the Fourth Amendment, one must determine whether a reasonable person would have believed he was free to leave. Mendenhall, 446 U.S. at 554, 100 S.Ct. at 1877. This court has considered this issue and determined that “it is the circumstances indicating intent to effect an extended restraint on the liberty of the accused, rather than the precise timing of an officer’s statements: ‘You are under arrest,’ that are determinative of when an arrest is actually made.” State v. Giovanni, 375 So.2d 1360, 1363 (La.1979) (quoting State v. Sherer, 354 So.2d 1038, 1042 (La.1978)).
95-1754, 682 So.2d at 718-19.
In State v. Fisher, 97-1133 (La.9/9/98), 720 So.2d 1179, the Louisiana Supreme addressed the issue of the admissibility of a defendant’s statement. The Court stated:
The outset inquiry on the admissibility issue is whether defendant had been arrested when he allegedly made the statements. If so, the next inquiry is whether the arrest was based on probable cause.... If there was no probable cause to support the arrest, the third inquiry is whether the alleged statements were inadmissible as the fruit of the unlawful arrest.
97-1133, 720 So.2d at 1182.
A warrantless arrest must be based on probable cause. Probable cause exists when the facts and circumstances known to the arresting officer and of which he has reasonably trustworthy information are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. State v. Tomasetti, 381 So.2d 420, 423 (La.1980), citing Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).
It is not a prerequisite for a finding of probable cause that the police know at the time of the arrest that a particular crime has definitely been committed. While knowledge of the commission of a crime is frequently an important factor in the determination of probable cause, probable cause may exist when the commission of a crime has not been definitely established. It is sufficient that it be reasonably probable that a crime has been committed under the totality of the known circumstances. State v. Simms, 571 So.2d 145 (La.1990). While it takes more and better evidence to provide probable cause when the police do not know a crime has been committed, probable cause is to be judged by the probabilities and practical considerations of everyday life on which average men, particularly average police [ uofficers, can be expected to act. State v. Drott, 412 So.2d 984 (La.1982); State v. Hebert, 95-1645 (La.App. 3rd Cir.6/5/96), 676 So.2d 692. In New York v. Harris, 495 U.S. 14, 21, 110 S.Ct. 1640, 1644-45, 109 L.Ed.2d 13 (1990), the supreme court held that where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State’s use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home without a warrant in violation of Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Probable cause for an arrest does not rest on the officer’s subjective beliefs or attitudes but turns on a *1099 completely objective evaluation of all of the circumstances known to the officer at the time of his challenged action. State v. Kalie, 96-2650 (La.9/19/97), 699 So.2d 879.
In State v. Landry, 98-0188 (La.1/20/99), 729 So.2d 1019, the lead detective testified at the motion to suppress the defendants’ statements that at the time he went to the defendants’ residence he did not have probable cause to arrest them because he did not have everything that he wanted. It was for this reason that he did not apply for an arrest warrant. The court stated that the fact that a better showing of probable cause could have been made if the officers seeking the warrant had waited for the development of available information does not detract from the showing of probable cause that was made. The state’s writ was granted and the case remanded to the district court to consider all information known collectively to law enforcement personnel involved in the investigation.
In the instant case, Detective Gif-ford, at the motion to suppress hearing, testified that as soon as Diaz opened the door he recognized him as the suspect on the tape. He stated that he informed Diaz of his rights, the defendant stated that he understood those rights and admitted to committing the burglary. Detective hsGifford stated that he then asked Diaz to get dressed and accompany him to the police station to give a statement and sign a waiver of rights form. Detective Gifford stated emphatically that Diaz was not under arrest and not handcuffed. Detective Gifford’s trial testimony differs from that which he gave at the motion to suppress hearing. At trial he testified that when Diaz opened the door he recognized him as the suspect he had seen on the tape and told him to get dressed and accompany him to the police station. He stated that after arriving at the police station he spoke to Diaz about fifteen minutes, informed him that he was a suspect in the burglary and that he was seen on the videotape. He stated that he then informed Diaz of his rights, and Diaz admitted that he committed the crime and agreed to sign a written statement and waiver of rights form. Detective Gifford stated that Diaz was not under arrest and was not handcuffed when he was transported to the police station. Detective Gifford’s statement that Diaz was not under arrest when he was transported to the police station does not preclude this court from assessing whether the facts and circumstances known to Detective Gifford at the time constituted probable cause to arrest the defendant. Detective Gifford testified that he viewed the videotape and recognized Diaz as the suspect when the defendant opened the door. Therefore, probable cause existed to arrest Diaz. Accordingly, the statement given at the police station was not the product of an illegal arrest. The trial court did not err in denying the motion to suppress the defendant’s statement.

CONCLUSION:

Accordingly, the defendant’s conviction and sentence are affirmed.
AFFIRMED.

. Napoli identified the tape in court as the surveillance tape taken from the business after the burglary. The tape was then played and viewed by everyone in the courtroom.