831 So.2d 962 (2002)
STATE of Louisiana
v.
Gwana GREEN, et al.
No. 2002-KK-1022.
Supreme Court of Louisiana.
December 4, 2002.
*964 Richard P. Ieyoub, Attorney General, Harry F. Connick, District Attorney, Jacques Y. LeBlanc, Valentin M. Solino, Counsel for Applicant.
Robert C. Jenkins, New Orleans, Jason R. Williams, Counsel for Respondent.
KNOLL, Justice.
In this criminal case, we are asked to consider whether the affidavit in support of a search warrant established the requisite probable cause. Finding that a practical, common sense reading of the affidavit established sufficient probable cause *965 for the issuance of a search warrant, we reverse the trial court's decision to suppress the evidence seized as the result of the execution of the warrant.

FACTS AND PROCEDURAL HISTORY
At approximately 4:00 p.m. on May 2, 2001, Detective Matthew Riles of the New Orleans Police Department Child Abuse Section was informed that J. S., a four year old child,[1] had been brought to the Medical Center of Louisiana with severe second- and third-degree burns[2] to more than 50% of his body. When Riles arrived at the hospital, he was told doctors were preparing to airlift the victim to Shriner's Burn Center in Galveston, Texas for emergency treatment.
The initial report the detective received at the scene indicated the victim had drawn his own bath water at approximately 11:00 the night before, tested the water on his own, and then slipped in scalding hot water while trying to exit the bathtub. Because of the severity of the burns, the detective did not take a statement from the child. Later, however, Detective Riles and Officer Lorenzo of the Public Integrity Division spoke with the defendants, Gwana Green and Noel Sanders.
After Green was advised of and waived her Miranda rights, she told the police that J.S. arrived home some time after 10:00 p.m. the night before he was brought to the hospital. She and her fiancé, Sanders, lived at an apartment at 8800 I 10 Service Road, Building Six, Apartment 19. When J.S. arrived, Green instructed him to draw his bath water while she ironed his clothes. The child complied with her instructions, although he complained about getting into the tub. She told the police that she was tired at the time and told J.S. to get into the tub. She then said she heard him get into the water and splash around "like he was washing" for approximately a minute. Green then heard her son complain that the water was too hot. She entered the bathroom to get him, but he fell back in the water when her grip slipped as she tried to pull him out of the bathtub. She successfully removed him from the bathtub on her second attempt and admonished him for getting into water that was too hot.
Green told the police J.S. looked a little "pink" when he got out of the bathtub. However, she contended she was not particularly concerned because both the child and Sanders frequently appeared that color after bathing, ostensibly because of their light skin tone. She further observed that the boy's toes appeared "wrinkled," but again claimed she did not find this odd. She remembered "patting" the boy's legs and body and stated he did not complain of any pain. Green stated she then spoke to unspecified pharmacists at Walgreens and doctors at Meadowcrest Hospital who recommended treatment for the child. Accordingly, she spent the rest of the evening applying antiseptic ointments and cool towels. The following *966 morning, she went to work and left the child in Sanders's care. Sanders was home during the day because he worked the evening shift at the New Orleans Police Department, Second District.
Officer Sanders also waived his Miranda rights and gave a statement. He claimed that while at work on May 1, he received a telephone call from Green, his fiancée, at about 10:50 p.m. She told him J.S. had drawn his own bath water and was in the tub for approximately a minute when he began to complain that the water was too hot.
When Sanders arrived home, he also noted the pink tone of his son's skin, but was not alarmed. He also stated his son's toes appeared wrinkled as if he had "been in water too long." Because the child appeared sunburned, Sanders asked the boy if anything hurt, and he replied in the negative.
It was not until the next day that Sanders noticed that his son's skin was peeling. He then made several telephone calls and at some point, decided to take his son to the hospital. However, rather than calling work, Sanders instead drove from their apartment across town to the Second District headquarters to ask his supervisor personally for an emergency furlough to tend to the child. On his way back, he stopped at the New Orleans Police Department Child Abuse Section and spoke with Commander Jeneiro Sanders to "let everyone know what was going on."
Evidently finding the statements of Green and Sanders did not satisfactorily explain the extent of the victim's injuries, on May 2, 2001, the detectives applied for a search warrant. The warrant application specified the defendants' address as the premises to be searched and stated that the purpose of the search warrant was the seizure of the following property: (1) photos of the crime scene; (2) the collection of any evidence of the crime; (3) the collection of "skin tissue" from the victim; (4) the testing of the water temperature of the residences; and (5) the collection of the victim's clothing. In support of the warrant application, Detective Aaron Blackwell[3] submitted an affidavit that offered the following facts:
Upon completion of the initial investigation Detective M. Riles and A. Blackwell learned the following. The victim was transported to Charity Hospital at about 3:08 p.m. on 05-02-2001. Upon arrival at the hospital the victim was noted to be suffering from major second and third degree burns covering over 55% of his body.
Additionally, the detective learned that the victim, his father (suspect) and his father's girl friend (suspect) all reside at 8800 I-10 Service Road, Apt. # 19. Additionally, the victim stated that the incident occurred at his residence last night (05-01-01).
It should be noted, the suspect's [sic] were advised of their rights as to investigation and agreed to make a statement. Based on the statement given by both suspect's [sic] the incident occurred at the above listed residence.
Based upon the affidavit presented, Magistrate Anthony Russo signed a search warrant at 11:30 p.m. on May 2, 2001.
Upon execution of the warrant, the detectives recovered gauzes, ointments, pieces of dead skin, and sheets stained with what appeared as blood. The officers *967 also tested the bath water and determined it could be run at a temperature of 160 degrees. The detectives consulted a chart from the Office of Juvenile Justice and Delinquency Prevention and learned that burns would occur to an adult after only an exposure of two seconds to 149 degree water and that a child would burn more quickly. After reviewing the results of the search, speaking to a few other unspecified parties, and re-interviewing Green, the victim's mother, the officers acquired arrest warrants for the defendants. They were both taken into custody without incident at the Child Abuse Section.
Subsequently, on September 27, 2001, the State filed a bill of information, charging Sanders and Green. As to Green it is alleged that on May 1, 2001, she "placed J.S., date of birth November 3, 1996, in water that caused him to suffer second degree burns over sixty-six percent (66%) of his body; Gwana Green also failed to seek medical treatment for J.S. for the injuries received for approximately sixteen (16) hours." As to Sanders, it is alleged that he "failed to seek and obtain medical attention for sixteen (16) hours after J.S., date of birth November 3, 1996, suffered second degree burns over sixty-six percent (66%) of his body."[4]
After entering pleas of not guilty, the defendants filed motions to suppress the evidence gathered pursuant to the search warrant.[5] In granting the defendants' motions to suppress the evidence, the trial court stated, "I have to be convinced from the affidavit contained in connection with this that there is sufficient evidence to establish that a crime has occurred and that evidence of that crime will be located at the place in which the officer seeks to serve this warrant." In further statement, the trial court referred to the affidavit's references to the "incident" and found that *968 from the "four corners" of the affidavit, it had no idea what, if any, crime occurred at the residence.
The Court of Appeal, Fourth Circuit, denied the State's application for supervisory writs, stating, "Based on the State's application we find that the trial court did not abuse its discretion by finding no probable cause for the issuance of the warrant and suppressing the evidence." State v. Green, 02K0215 (La.App. 4 Cir. 3/12/02). We granted the State's application for supervisory writs to review the correctness of the lower courts' rulings. State v. Green, 02KK1022 (La.6/7/02), 817 So.2d 1140.

LAW AND DISCUSSION
It is a basic tenet of this state's constitution that every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. LA. CONST. ANN. art. I, § 5. A judge may issue a warrant authorizing the search for and seizure of any thing within the territorial jurisdiction of the court which "[m]ay constitute evidence tending to prove the commission of an offense." LA.CODE CRIM. PROC. ANN. art. 161(A)(3).[6] It is also well accepted that a search warrant may issue only upon probable cause established to the satisfaction of the judge, by the affidavit of a credible person, reciting facts that establish the cause for the issuance of the warrant. LA. CODE CRIM. PROC. ANN. art. 162. As provided in this state's constitution and the Code of Criminal Procedure a search warrant shall particularly describe the person or place to be searched, the person or things to be seized, and the lawful purpose or reason for the search. LA. CONST. ANN. art. I, § 5; LA.CODE CRIM. PROC. ANN. art. 162.
Probable cause sufficient to issue a search warrant "exists when the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information, are sufficient to support a reasonable belief that an offense has been committed and that evidence or contraband may be found at the place to be searched." State v. Johnson, 408 So.2d 1280 (La.1982). A magistrate must be given enough information to make an independent judgment that probable cause exists to issue a warrant. See, e.g., State v. Manso, 449 So.2d 480, 482 (La.1984), cert. denied sub nom., Manso v. Louisiana, 469 U.S. 835, 105 S.Ct. 129, 83 L.Ed.2d 70 (1984). The United States Supreme Court held that "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." United States v. Leon, 468 U.S. 897, 915, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (citations omitted). Moreover, this Court previously held: "[t]he process [of determining probable cause] simply requires that enough information be presented to the issuing magistrate to enable him to determine that the charges are not capricious and are sufficiently supported to justify bringing into play the further steps of the criminal justice system." State v. Rodrigue, 437 So.2d 830, 833 (La.1983) (citing Jaben v. United *969 States, 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965)).
An issuing magistrate must make a practical, common sense decision whether, given all of the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place. State v. Byrd, 568 So.2d 554, 559 (La.1990). This affidavit must contain, within its four corners, the facts establishing the existence of probable cause for the warrant. State v. Duncan, 420 So.2d 1105 (La.1982); State v. Wells, 253 La. 925, 221 So.2d 50 (1969). In Wells, the source of the "four corners" doctrine" in this state, this Court noted that Article 162 required that the facts establishing probable cause be recited in the affidavit because the judge, not the affiant, is the one who must be satisfied as to the existence of probable cause. LA.CODE EVID. ANN. art. 703(D) states that when evidence is seized pursuant to a search warrant, the defendant bears the burden of proof at a trial on his motion to suppress that evidence. The task of a reviewing court is simply to insure that under the totality of the circumstances the issuing magistrate had a "substantial basis" for concluding that probable cause existed. Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Accordingly, in Rodrigue, we stated, "The magistrate's determination of probable cause, prior to issuance of a search warrant, is entitled to significant deference by the reviewing court and marginal cases should be resolved in favor of finding the magistrate's assessment to be reasonable." Rodrigue, 437 So.2d at 833. Moreover, if the magistrate finds the affidavit sufficiently detailed and reliable to show probable cause, reviewing courts should interpret the affidavit in a realistic and common sense fashion, aware that it is normally prepared by non-lawyer police officers in the midst and haste of a criminal investigation. Within these guidelines, courts should strive to uphold warrants to encourage their use by police officers. State v. Jenkins, XXXX-XXXX (La.6/22/01), 790 So.2d 626 (citing United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)); State v. Loera, 530 So.2d 1271, 1278 (La. App. 2 Cir.1988), writ denied, 536 So.2d 1252 (La.1989).
From the outset, we note the trial court hinged its judgment on the fact that the affidavit failed to even establish that a crime had occurred. Although certainty of knowledge of the commission of a particular crime is frequently an important factor in the determination of probable cause, probable cause may exist when the commission of a crime has not been definitely established, but is reasonably probable under the totality of the known circumstances. State v. Simms, 571 So.2d 145, 149 (La.1990). The police therefore need not specify exactly what crime has been committed as long as they have probable cause to believe that a crime has been committed. See WAYNE R. LAFAVE, SEARCH AND SEIZURE, § 3.1(b), p. 7 (1996) (stating that two conclusions necessary to the issuance of the search warrant must be supported by substantial evidence: that the items sought are in fact seizable by virtue of being connected with criminal activity, and that the items will be found in the place to be searched).
The determination of probable cause, although requiring something more than bare suspicion, does not require evidence sufficient to support a conviction. Probable cause, as the name implies, deals with probabilities. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Simms, 571 So.2d at 148. The determination of probable cause, unlike the determination of guilt at trial, does not require the fine resolution of conflicting *970 evidence that a reasonable doubt or even a preponderance standard demands. Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); Rodrigue, 437 So.2d at 830. The determination of probable cause involves factual and practical considerations of everyday life on which average men, and particularly average police officers, can be expected to act. Simms, 571 So.2d at 149; State v. Ogden and Geraghty, 391 So.2d 434 (La.1980). Likewise, probable cause will not be defeated simply because innocent explanations for an activity can be imagined. LAFAVE, SEARCH AND SEIZURE, § 3.2(e), p. 69. Probable cause exists if a "succession of superficially innocent events had proceeded to the point where a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one." Id. at 70 (quoting United States v. Patterson, 492 F.2d 995 (9th Cir. 1974)).
In the present case, the language of the affidavit informed the issuing magistrate that: (1) the detectives had conducted an initial investigation; (2) the victim[7] stated at the hospital that an incident[8] had occurred at his residence the night before; (3) the victim was transported to Charity Hospital at approximately 3:08 p.m.; (4) the victim suffered from major second and third-degree burns covering over 55% of his body; (5) the victim, his father, and his father's girl friend all reside at 8800 I-10 Service Road in Apartment 19; (6) the father of the victim and his girl friend were identified as suspects[9]; (7) the suspects were Mirandized as to the investigation and then made a statement to the police about the incident that occurred at their residence.
Although it cannot be gainsaid that more facts would have been helpful to more fully inform the issuing magistrate, nonetheless we find the magistrate could have concluded that a crime had been committed just from the references to a victim, an incident, the use of the word suspects, and that the suspects were Mirandized.[10] In addition, the affidavit informed the magistrate that a familial relationship existed, at least between the father and the victim, and that all of the parties lived at the same residence. Moreover, when viewed in light of the horrific injuries described in the affidavit ("major second and third degree burns covering over 55% of his body"), the magistrate would have also learned that a minimum of fifteen hours had elapsed between the time of the incident ("last night (05-01-01)") and the arrival of the victim at Charity Hospital ("3:08 p.m. on 05-02-2001") for medical treatment. Viewing the totality of the circumstances and a common sense reading of the affidavit, we find the issuing magistrate's assessment of the supporting affidavit to be reasonable, and that it had a substantial basis for concluding that probable caused existed for the issuance of the search warrant. Accordingly, we find the lower courts erred in failing to attribute deference to the issuing magistrate's determination *971 of probable cause. Therefore, the rulings of the trial court and the appellate court are reversed and set aside, and the defendants' motions to suppress the evidence seized pursuant to the search warrant are hereby denied. This case is remanded to the trial court for further proceedings consistent with the ruling herein.
REVERSED AND REMANDED TO THE TRIAL COURT.
KIMBALL, J., dissents and assigns reasons.
KIMBALL, Justice, dissenting.
I dissent from the majority's determination that the issuing magistrate had a substantial basis for concluding that probable cause existed for the issuance of the search warrant. The facts presented by this case are undeniably horrible, but the majority seriously strains the import of each word contained in the affidavit to reach a desirable result. In my view, the lower courts properly looked beyond the heinous nature of the child's injuries and correctly determined that the affidavit did not present probable cause for the issuance of the warrant and, consequently, that the evidence must be suppressed.
NOTES
[1] The bill of information shows that the child's birth date is November 3, 1996. At the time of this alleged crime, the child would have been almost four and a half years of age. Pursuant to the provisions of LA. SUP CT. RULE XXXII, this opinion will refer to the minor child by initials.
[2] The division of burns into three degrees is recognized for geographical designation: first degree burn involves only the epidermis and causing erythema and edema without vesiculation; second degree burn involves the epidermis and dermis and usually forms blisters that may be superficial or deep dermal necrosis, but with epithelial regeneration extending from the skin appendages; third degree burn involves the destruction of the entire skin. STEADMAN'S MEDICAL DICTIONARY 201-02 (5 ed.1982).
[3] Although only Detective Blackwell signed the warrant application as an affiant, the body of the application for a search warrant indicates that Detective Riles, Detective Blackwell, and Sergeant Joseph Lorenzo personally appeared before the Criminal District Judge, Section 4.
[4] There is some discrepancy as to which particular criminal statute Green and Sanders are charged with having violated. The arrest warrants show the defendants were arrested "to answer a charge of 14:93.2, second degree cruelty of a juvenile." The obverse side of the bill of information, partially tracking the language of the arrest warrant, references LA. REV.STAT. ANN. § 14:93.2. After referring to LA.REV.STAT. ANN. § 14:93.2, we have identified that crime as the unlawful tattooing and body piercing of minors. The docket master for the Orleans Parish Criminal District Court references the crimes charged as a violation of LA.REV.STAT. ANN. § 14:93, cruelty to a juvenile. The priority filing sheet filed by the State in this Court references the crime as second-degree cruelty to juveniles, a violation of LA. REV.STAT. ANN. § 14:93.2.3. From the language quoted from the bill of information, it is clear that the reference on the obverse side of the bill of information to LA.REV.STAT. ANN. § 14:93.2 is clearly a typographical error.

LA.REV.STAT. ANN. § 14:93.2.3, second-degree cruelty to juveniles provides:
A. (1) Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.
(2) For purposes of this Section, "serious bodily injury" means bodily injury involving protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or substantial risk of death.
B. The providing of treatment by a parent or tutor in accordance with the tenets of a well-recognized religious method of healing, in lieu of medical treatment, shall not for that reason alone be considered to be intentional or criminally negligent mistreatment or neglect and shall be an affirmative defense to a prosecution under this Section.
C. Whoever commits the crime of second degree cruelty to juveniles shall be imprisoned at hard labor for not more than forty years.
[5] Separate motions to suppress the defendants' statements and photographs of the burn victim were denied. The denial of these motions was not appealed. Also not appealed was the trial court's finding that probable cause existed for the defendants' arrests.
[6] Assuming the police had probable cause to believe a crime had occurred when they applied for the warrant, the officers could lawfully seize not only the sloughed-off pieces of the victim's skin, but also test the water temperature in the bathroom as evidence tending to prove the commission of a crime. For purposes of the Fourth Amendment, no distinction exists between the fruits and instrumentalities as the object of a search and "mere evidence." Warden v. Hayden, 387 U.S. 294, 306-07, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).
[7] "Victim" is defined, inter alia, as "one that is subjected to oppression, hardship, or mistreatment." WEBSTER'S NEW COLLEGIATE DICTIONARY 1295 (1982).
[8] "Incident" is defined, inter alia, as "an action likely to lead to grave consequences,...." WEBSTER'S NEW COLLEGIATE DICTIONARY 575 (1982).
[9] "Suspect" is defined, inter alia, as "one suspected of a crime." WEBSTER'S NEW COLLEGIATE DICTIONARY 1165 (1982).
[10] Just the reference in the affidavit to the issuance of Miranda warnings would have conveyed to the magistrate that these persons had at least been detained in connection with an investigation of an offense and advised of their constitutional rights. See LA.CODE CRIM. PROC. ANN. art. 218.1.